UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/26/16
```

ETHAN MURPHY, *et al.*,

                        Plaintiffs,

-v-

PHILIPPE LAJAUNIE, *et al.*,

                        Defendants.

No. 13-cv-6503 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

    The Court is in receipt of Defendants' motion, dated July 22, 2016, requesting the Court's leave to file their renewed motion to withdraw pursuant to Local Civil Rule 1.4 under seal. (Doc. No. 244.) Specifically, Defendants seek to seal: (1) their attorneys' letter requesting leave to withdraw and (2) Defendant Philippe LaJaunie's letter to the Court which, among other things, sets forth his complaints regarding his attorneys' performance; avers that Defendants have, notwithstanding their own lawyers' representations to the contrary, complied with the Court's recent discovery orders; and urges the Court to reconsider its previous order of sanctions against Defendants. (Doc. No. 245-1 ("July 14 Order").) For the reasons set forth, Defendants' motion to seal is granted in part and denied in part.

    The Second Circuit has articulated a three-step inquiry for determining whether documents submitted to the Court may be sealed in light of the presumption of open access to "judicial documents." *Lugosch v. Pyramid Co. of Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006); *see also Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 139–143 (2d Cir. 2016). First, in order for the presumption of open access to attach, the documents at

issue must be "judicial documents," which are "item[s] filed [that are] relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 119. Second, if the documents at issue are "judicial," the Court must then determine the weight of the presumption of access by considering the value of the information in the "exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* Finally, the Court "must balance competing considerations" against the presumption of access. *Id.* at 119–120 (citation and quotation marks omitted). "Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Id.* at 120 (internal quotation marks omitted). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action . . . ." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Court has no trouble concluding that Defendants' letters are "judicial documents," since they are relevant to the Court's adjudication of Defendants' attorneys' motion to withdraw and the Court's potential imposition of additional sanctions, including a default judgment, on LaJaunie for Defendants' discovery abuses. Furthermore, the Court concludes that the weight of the presumption that attaches to Defendants' submission is strong. Since attorneys are "officer[s] of the court," *Wilder v. GL Bus Lines*, 258 F.3d 126, 130 (2d Cir. 2001), a submission in support of a motion to withdraw is "highly relevant to the exercise of Article III judicial power." *Bernstein*, 814 F.3d at 142. Because LaJaunie's letter includes a slew of arguments and allegations relevant to the Court's imposition of sanctions against him, it is also highly relevant to the Court's performance of its "Article III duties of deterring abuses of the judicial process and

imposing sanctions to achieve that end, if necessary." *Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 528 F. Supp. 2d 197, 205 (S.D.N.Y. 2007) (citation and brackets omitted).

With respect to the third prong of the analysis, however, there are several references in Defendants' submission to attorney-client communications. *See United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996) (noting that the attorney-client privilege applies to: "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice"). Preservation of the attorney-client privilege "is precisely the kind of countervailing concern that is capable of overriding the general preference for public access to judicial records." *Diversified Grp., Inc. v. Daugerdas*, 217 F.R.D. 152, 160 (S.D.N.Y. 2003) (quoting *Siedle v. Putnam Invs.*, 147 F.3d 7 (1st Cir. 1998)). Furthermore, courts "routinely . . . seal" documents submitted in connection with a motion to withdraw "where necessary to preserve the confidentiality of the attorney-client relationship between a party and its counsel." *Thekkek v. LaserSculpt, Inc.*, No. 11-cv-4426 (HB)(JLC), 2012 WL 225924, at *3 (S.D.N.Y. Jan. 23, 2012) (quoting *Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, 464 F.Supp.2d 164, 166 (E.D.N.Y. 2006)). In fact, as Defendants correctly note, the Local Civil Rules expressly contemplate redacting the contents of motions to withdraw. *See* Local Civil Rule 1.4 (noting that requirement that attorney seeking to withdraw must submit supporting affidavit "is not meant to preclude the Court from permitting the reasons for withdrawal to be stated in camera and under seal in an appropriate case").

Nevertheless, there are numerous statements made by LaJaunie in his letter that do not reference confidential attorney-client communications. Furthermore, while the Court recognizes that Defendants' counsel has a duty to avoid disclosure of a client's secrets, which include information that "would be embarrassing or would be likely to be detrimental to the *client*,"

*United States v. Armaza*, 280 F. Supp. 2d 174, 182 (S.D.N.Y. 2003) (emphasis added) (quoting New York Disciplinary Rule 4-101(a)), much of LaJaunie's letter contains grievances regarding his *lawyers*, which counsel is under no obligation to protect from disclosure. Moreover, many of LaJaunie's statements in his letter are highly relevant to the discovery disputes that have prompted the Court's July 14 Order, and will be considered by the Court in deciding whether to award a default judgment in Plaintiffs' favor.

Therefore, the Court, having "weigh[ed] competing interests," exercises its authority "to edit and redact [the] judicial document[s] in order to allow access to appropriate portions of the document[s]." *United States v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995). Specifically, the Court will redact references to privileged communications and other personal information, such as LaJaunie's personal phone number and email address. In light of LaJaunie's public statements in Court in the presence of Plaintiffs' counsel concerning Defendants' financial condition and his dissatisfaction with counsel (Doc. No. 228 at 11:1-3, 17:2-7, 20:5-24, 22:8-23:2, 24:5-10), the Court sees no need to redact any other portions of the submission, even if they may cause Defendants and their lawyers some minor embarrassment.

Accordingly, IT IS HEREBY ORDERED that Defendants' motion to seal is granted in part and denied in part. The Clerk is respectfully directed to publicly file the redacted document attached to this order and to terminate the motion pending at docket number 244.

Having reviewed the parties' submissions in response to the July 14 Order, the Court also finds that a hearing would be useful for resolving several disputed issues of fact regarding Defendants' compliance (or lack thereof) with the Court's discovery orders. Accordingly, IT IS HEREBY ORDERED that the attorneys in this matter, as well as LaJaunie personally, shall

attend a status conference on Tuesday, August 2, 2016 at 5:00 p.m. in Courtroom 905 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.

SO ORDERED.

Dated:       July 26, 2016
             New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE



KAUFMAN DOLOWICH VOLUCK
ATTORNEYS AT LAW

Jeffery A. Meyer, Esq.
jmeyer@kdvlaw.com

Kaufman Dolowich & Voluck, LLP
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797

Telephone: 516.681.1100
Facsimile: 516.681.1101
www.kdvlaw.com

July 20, 2016

## CONFIDENTIAL EX PARTE COMMUNICATION

VIA EMAIL SullivanNYSDChambers@nysd.uscourts.gov
The Honorable Richard J. Sullivan
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

                Re:    *Murphy et al. v. LaJaunie et al.*
                       Case Number: 13 CV 6503 (RJS)

Dear Judge Sullivan:

    We represent the Defendants in the above referenced matter.

    On July 14, 2016, we forwarded the Court's decision awarding sanctions to Defendants ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ we believe we are compelled to forward Defendants' letter to the Court. However, as Defendants letter references privileged communications, and contains statements that may be harmful to their position, we felt it was prudent to submit their letter *in camera*. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

    Naturally, we wholly dispute Defendants' characterization of our efforts to date and if required by the Court, we can fully refute all the allegations levied against this firm. However, we do not believe it is necessary to do so at this time. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ To the extent that Defendants' letter asks for reconsideration of the Court's imposition of sanctions, it was the intention of this office to make that application only after Defendants produced all outstanding discovery.

    Unfortunately, as this letter clearly demonstrates, our relationship with Defendants has broken down completely, and beyond the point where we can continue to represent them effectively. Although Defendants will not follow our instructions, we will continue to attempt to

Hon. Richard J. Sullivan
July 20, 2016
Page 2

foster their compliance with the Court's directives. Notwithstanding same, as our conflict with Defendants is demonstrable and irrevocable, we hereby re-new our motion to withdraw as counsel incorporating our prior basis to be relieved, as well as the content of our clients' attached correspondence.

Thank you for your consideration of the foregoing.

                                         Respectfully submitted,
                                         Kaufman Dolowich & Voluck, LLP

                                         Jeffery A. Meyer, Esq.

CC:    Philipe Lajaunie, by email

4815-1589-0741, v. 1

# EXHIBIT A

The Honorable Richard J. Sullivan

United States District Court

Southern District of New York

40 Foley Square

New York, NY 1007

By regular USPS mail and email at: sullivannysdchambers@nysd.uscourts.gov

Case Number 13 CV 6503 (RJS)

Murphy et al. v. Lajaunie et al.

Defendants' contact information:

Philip Lajaunie, First Admin Inc.

[redacted]

[redacted]

**Defendants' letter to the Court**

Re: Motion to Withdraw from Defendants attorneys, request for Document Production, and Sanctions against Defendants

Your Honor,

Please accept my apologies for contacting your Chambers directly, but it appears that my lawyers are not representing me and the co-defendants to the full extent of their obligations, and I cannot get information from them to what Plaintiffs' attorneys claim they are actually missing. Since daily sanctions have been ordered by the Court, I have no other choice but to inform the Court of what the situation is and has been in reality, and implore for the Court to reverse its decision.

On June 21, 2016, a hearing was held before your Court to hear arguments about our lawyers' (Jeffrey Meyer and Aaron Solomon from Kaufman Dolowich & Voluck, LLP firm. "KDV") Motion to Withdraw. Their arguments were that they were not paid anymore. Your Decision was to deny their motion. Defendants have not received your Decision by written document, and a call on July 13, 2016 to your Chambers to request such document has not still been responded to.

[redacted]
[redacted]

████████████████████████████████████████████
██████████

██████████████████████████████ Defendants rushed to prepare as many boxes as they could. As directed, five boxes were delivered on June 27 to the Goldman office, and five more boxes were delivered to the Kirshenbaum office (both lawyers for plaintiffs, collectively "G/K"). Unbeknown to the defendants, KDV also sent "un-redacted Class files" to G/K, on or about June 26.

G/K immediately sent a complaint to the Court claiming that only the class list had been sent, misleading the Court, and not rectifying after the Court ordered:

"The following transaction was entered on 6/30/2016 at 9:35 AM EDT and filed on 6/29/2016

Case Name:     Murphy et al v. LaJaunie et al

Case Number:   1:13-cv-06503-RJS
Filer:

Document Number:   227
Docket Text:

MEMO ENDORSEMENT on re: [226] Letter, filed by Stephanie Castillo, Efrain Ramirez, Nicole Clouse, Nyamka Ayinde, Kurt Roediger, Christopher L. Scott. ENDORSEMENT: Based on Plaintiffs' letter, it appears Defendants and their counsel, who have not been relieved from this action, have not even attempted to comply with the Court's order, dated April 15, 2016, other than to produce a class list. (Doc. No. 219.)"

*In reality, G/K had 10 boxes of documents, which –to this date- have not been accounted for, by either G/K or KDV in their correspondence to the Court.*

For the record, Defendants do not know what is contained in the "Class List". KDV had not informed defendants that they had such un-redacted document in their office, and KDV sent it to G/K before informing Defendants, or giving Defendants an opportunity to review those documents. Defendants do not know how KDV took possession of these documents, or their actual content. Despite KDV sending the "Class List" to G/K, KDV is still requesting from Defendants to send the "Class List".

After the June 28 delivery, defendants kept looking for documents, and collected all those that fit the description of the requested Production. These additional documents filled 12 boxes, which were inspected and indexed by KDV in our offices on Thursday July 7 (by order of the Court), before being delivered to G/K on Friday July 8. To Defendants' best knowledge, the request for production has been fully or substantially fulfilled. Defendants also have to mention a puzzling comment from one of their advisors, that the requested documents are in fact premature at this stage of the proceedings.

Defendants implore the Court to reverse its Decision imposing sanctions, as its Decision was based on willfully false information provided by Plaintiffs (G/K) and not rectified by defendants' attorneys (KDV).

Moreover, in a time of heavy losses, defendants are unable to sustain such payments, as each day is equivalent to a dishwasher's weekly salary, which defendants have had difficulties paying in the last few months.

**Delays in Production of Documents**

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ Indeed, Lajaunie appeared at all initial court hearings. ████████████████████████████████████████████████████
████████████████████. KDV did not inform Defendants of the all-important April 15, 2016 Hearing. They simply emailed the request for Production of Documents on April 29 –two weeks later. At that date, defendants had abruptly lost their main restaurant at Park/29th Street (March 30), which also housed the corporate office for all operations, including those at 15 John Street. Defendants had to move out in 9 days from a location it had occupied for over 25 years, to various storage locations and the remaining restaurant on John Street.

Had KDV informed defendants of the April 15 Hearing (two weeks after the move, and still dealing with a mass of obligations to staff, suppliers, licenses, bizarrely antagonistic media, etc.), defendants would have had the opportunity to explain to the Court that being given the circumstances, an additional three to four weeks would help in perfecting the Production. Not only defendants had lost most of their office staff, but all documents were dispersed; moreover the initial two weeks (April 15-29) would also have provided an extra period of time. In the end, all documents were produced within the final timeline, ending July 8, 2016.

**KDV Motion to Withdraw**

Since two incidents were not addressed during the hearing, both with current and long-term consequences, it is Defendants' necessity to clarify the fees issue.

Defendants had contracted three EPL policies, covering both restaurants, as well as the administrative company (LHLM Group, then First Admin Inc., as well as Lajaunie personally and as Executive). Each policy provides for $100,000 in legal fees. The insurance company designated the law firm: KDV. Since inception of the case (2012), we have requested monthly billing from KDV. Indeed, even if paid by the insurance coverage, proper billing is paramount for defendants to be able to sustain a long-term defense. *Despite repeated requests along the years, no billing was provided.* Recently, KDV claimed that they had run close to $300,000 in legal fees, an extraordinary amount. Since defendants have had no income and no reserve for the last three years (to be clarified later on), KDV became impatient and threatened to withdraw, until they filed the Motion to Withdraw. *In preparation for the Hearing, KDV finally delivered their billing records, on Friday June 17, 2016 at 6 pm; four years from the first request, and one business day before the hearing.*

It may or may not be appropriate to argue here why KDV's billing is unreasonable and undue, from double or triple billing for menial matters, to systematically have two to three attorneys copied on all correspondence, even the most insignificant. But defendants strongly believe, based on their interactions with KDV and professional advice, that the total charges since inception should not be higher than $150,000. On that basis, KDV has already been overpaid by $50,000, as two policies have been disbursed and exhausted.

The third policy has not been disbursed; the insurance company is fighting against paying it, although both the administrative company and Lajaunie are clearly and amply covered. Defendants had to hire a specialized attorney (an unwelcome expense in Defendants' situation) to start a formal request process, which may have to end in a legal procedure. This independent attorney (Jason Stern), ██████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████ Meyer then showed up at the hearing and had his first interactions with defendants in the courtroom.

Defendants believe it was important to introduce these points to explore a much larger issue, in which Defendants believe now, based on the recent events and looking back through the same lens, that they have been misrepresented since inception of the Murphy et al v. Lajaunie et al legal proceedings.

To put the writer's thoughts into a non-legal universe (helping the writer clarify his thoughts, and not reflecting on the Court's comprehension), Defendants' situation is akin to fighting lung cancer (while being non-smokers) with doctors who are looking for the most expensive procedures and treatments, regardless of whether it is good for the patient or not –and even if it is seriously damaging the patient.

Similarly, should defendants' lawyers have prioritized defendants' defense over their legal fees, the Class Certification would not have occurred.

**Class Certification**

It is Defendants' strong belief that the Class Action should not have been certified. Indeed, defendants have worked very hard to provide all material for KDV to successfully argue before the Court that the Action does not merit Certification. None of this material was used, none was produced, leading to Certification based on false appearances. The Court was misled by two teams of attorneys (KDV and G/K) working for only one purpose: augment their fees as much and as fast as possible.

No discovery, no deposition, no document, no testimony have shown that there was any organization to deprive any employee from his just revenue. No system was in place to deprive any employee from monies due to him or her by forcing a portion going to a manager, a co-worker, or the company, under any circumstance. No systemic fault was observed or found. Quite the opposite, all systems were built to prevent such events.

Moreover, as soon as the law suit was filed, Lajaunie organized a complete interviewing of the whole staff of both restaurants, during which staff was met in large groups and then in groups with similar grievances, and even individually. All meetings were audio recorded. Not two employees had the same grievance, and none related to pay, or tips sharing. The closest complaint was that "M'ds used to get 5% when before the expansion (the restaurant at Park/29 expanded in size in 2004), while now they take 10%". It turned out to be a bad recollection, and that in fact, M'ds always took 10%. At the time, KDV

said that these recording "were invaluable", since they showed "no common cause of action". All recordings were sent to KDV, yet none were produced at any point of the proceedings.

### Missed opportunities to settle

Defendants have repeatedly requested to settle, as these proceedings are –mostly- unfounded. The perceived initial goal of rectifying payroll errors for employees' benefit has been drowned under extraordinary legal fees claims, and lawyers are now altering the normal court proceedings, burdening the Court with unnecessary actions.



### Current context

Plaintiffs are represented by two law firms: one is headed by Mr. Goldman, and the other by Mr. Kirshenbaum.

Goldman's firm initiated the proceedings. Their tactics are uniformly applied to every restaurant group they pursue: send a Notice for a small claim. In defendants' case, the original Murphy Notice was for a $12.40 Spread of Hours mistake. Shortly afterwards, "information" was given to certain media (always the New York Post and Daily News) which published, before any complaint was filed, that there was a Class Action against Defendants. This Notice gave Goldman the opportunity for some basic discovery, which led to the first formal complaint. By then, the Spread of Hours claim disappeared, as all records showed that there never was any such mistake.

Goldman's tactics are supposed to put pressure onto the defendants, akin some small town Mafia arm-twisting. There is only one series of consequences that Defendants have observed: it kills the golden goose that can pay legal fees and judgment proceeds. Indeed, Defendants had expected the staff to protect and invest on the business that was going to pay them the riches promised by their attorneys. Instead, staff walked out "because of all the money they were going to make", others morphed in inactive, yet impatient entitled beings with no sense of service anymore, and the great majority of the old timers who had spent decades to create unique, soulful restaurants ended up leaving. In turn, managers left; and between the disfranchised staff and newly acquired bad reputation of the restaurants, business faltered from healthy and profitable to being money-losing operations. In the mist of the staff's shuffle, it was discovered that some bussers and bartenders had already been plaintiffs in other restaurants, and were already involved with the Goldman Law firm. It is Defendants' opinion that the Goldman firm is working with several individuals who work in successive restaurants and provide the firm with initial complaints, whether founded or not.

Defendants were looking forward to renewing their lease at the Park/29th Street location, to transform the restaurant and raise capital to rejuvenate this 25 year old operation. In the mist of difficult negotiations with that location's landlord, a temporary arrangement was made, secured by an Order to Vacate vs. using security funds. Goldman mysteriously took possession of the Order, and circulated it to some of the plaintiffs. The immediate result was for the staff to walk out, believing that the restaurant was to close imminently. This in turn took away any opportunity and means to finalize the lease negotiations, and the restaurant closed abruptly on March 23, 2016, to be able to vacate on March 31, 2016.

Later on, in some meeting between KDV and Goldman (but not attended by defendants, as they were not notified), Meyer supposedly asked Goldman why he had done such a senseless thing. Goldman responded –according to Meyer- that he had not realized what the consequences were going to be, and apologized.

As for Mr. Kirshenbaum, his firm joined later on. There was a meeting with Goldman and Kirshenbaum in October 2014. At the end of the meeting, after concluding a tentative settlement, Mr. Kirshenbaum leaned back and said to Lajaunie (in front of Meyer): "you closed my mother's kosher restaurant when you opened your Glatt Kosher restaurant in 1995. Did you know that?"

**Defendants' situation**

At this stage, defendants have no more resources. After losing profits for the last three years, they have lost the more profitable of their two restaurants. The remaining restaurant is a money loser. Floor staff –which includes plaintiffs- keeps undermining and sabotaging the meager management that still accepts to make attempts at progress.

At this stage, defendants have no resources (another premise to Class Certification) and no capital, as it has all vanished in the last three years. Defendants are also heavily indebted.

Defendants' opinion is that they are not represented properly, or may even be _willfully represented against their interest_. However, defendants have no cash to hire a new law firm, and wish to keep KDV for the basic legal work and understanding of the rules. Defendants implore the Court to render an equitable judgment, so defendants can attempt to negotiate a payment plan as promptly as possible, and effectuate the changes that are necessary to improve its remaining restaurant.

The foregoing is based on Lajaunie's understanding of the proceedings, readings, and recollections. Should an element be inaccurate, or poorly phrased, or misunderstood, there is no willful intent to misguide the Court.

Defendants are deeply appreciative of the Court's time taken to read this letter