UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ETHAN MURPHY, et al.,

                                    Plaintiffs,

      -v-                                                No. 13-cv-6503 (RJS)

PHILIPPE LAJAUNIE, et al.,

                                    Defendants.

------------------------------------------------------------x

**Motion for Reconsideration and for Relief from an Order, pursuant to Rule 60(b)**

**Background**

Plaintiffs, in their letter dated March 29, 2019, state that:

1. [paragraph 1] Defendant's objections are "a clear attempt to stall and delay judgment"
2. [paragraph 4] "To calculate the damage allocation, Plaintiffs use the class list that Defendants previously provided to Plaintiffs"
3. [paragraph 4]"In other words, the people Lajaunie now seeks to exclude from the class are people who *Defendants (sic)* previously determined were in fact class members."
4. [paragraph 5] "Lajaunie's contention that Les Halles Park Ave (LBI) should be excluded from the class…should be rejected"
5. [paragraph 7] "It is clear that Lajaunie is seeking to avoid the finality of the Court's previous decisions and the finality of a judgment"
6. [paragraph 7] "…and that Plaintiffs' counsel be required to spend additional uncompensated time going through boxes of Defendant's documents to rectify fabricated deficiencies."
7. Since the onset of this action, the Corporate Defendants and Defendant Lajaunie have always been extremely responsive in working with the law firm that was dispatched by the restaurants' insurance companies, as well as later, with Lajaunie representing himself Pro se, providing timely answers and replies.

8.  There was a period of confusion when Lajaunie's main restaurant (LBI, a.k.a. "Les Halles" located on Park Ave South) closed abruptly. Defendants had to immediately move out of their administrative office were records had been maintained for 25 years, and lost most of its administrative staff, including the additional staff hired specifically to provide discovery material. This event occurred after four years of discovery, which generated hundreds of thousands of documents, including audio recordings establishing that not two employees had the same grievance (a prerequisite to a class action). By all accounts, the discovery was nearly complete. Only a certain list of employees was being requested by Plaintiffs, a list that Plaintiffs wanted to obtain as a document presented in the "Excel" format. Lajaunie did communicate to the Court his difficulties at the time, in managing to find the original records among hundreds of boxes –mixed in the precipitated move to storage- containing seven years of records of many businesses, managing the extraordinary upheavals in his businesses, and analyzing seventeen (17) boxes of original business records to compose the list in the format requested by Plaintiffs.

9.  Concurrently, Defendants' lawyers were expressing frustration with one of the three insurance policies' firm, which was making difficulties to pay them.

10.  When it became clear that the delays in producing the requested list were going to penalize Defendant Lajaunie personally, his lawyers advised him to deliver the boxes of original records directly to Plaintiffs' lawyers, "and let them prepare the list."

11.  Following their advice, Lajaunie promptly delivered the original records, in seventeen (17) boxes, to the offices of Plaintiffs' lawyers.

12.  Unbeknownst to Lajaunie, a newly hired lawyer at Defendants' law firm was attempting to prepare the requested list, based on material whose provenance could not be the original records.

13.  That list is the one that now Plaintiffs state they chose to use to calculate their allocations. Defendant submits that Plaintiffs pushing their flawed list through the various stages of these legal proceedings, without revealing to the Courts that their list was not composed from verified records, while fighting Defendant Lajaunie's assertions that only the material contained in the 17 boxes he delivered to Plaintiffs was true material, does not render their list proper, correct and legitimate. Plaintiffs' requests to simply reject

Defendant's Objections is inappropriate and perpetuate grave errors to the claimants and grave injustice to Defendant Lajaunie. Plaintiffs' expeditious methods have made that list impact hundreds of claimants' allocations, and potentially subject Defendant Lajaunie to a $6,000,000 judgment for an unfounded and baseless punishment.

**Affidavit**

14. Addressing Plaintiffs' first notable statement in (1) above, Defendant does confirm that he wants to delay the Final Judgment, because Plaintiffs' letter now delivers new and unprecedented proofs that they have misled the Court as of the content of the boxes, which is the one and only foundation of the Default against Defendants, and punishment against Lajaunie personally. Moreover, *Plaintiffs now admit to two possible methods to prepare their allocations, and in choosing the easy prepared list (see 2 above) of dubious origin instead of Defendant Lajaunie's original records, Plaintiffs *knowingly and willfully* impact accurate awards to hundreds of claimants, and through the same choice, misled the Court into punishing Lajaunie personally for a situation that did not occur, for an extraordinary and wholly inappropriate $6 million punitive amount.

15. In Plaintiffs statement in (3) above, Plaintiffs now make a difference between "*Defendants*" (i.e. Defendants' lawyers) and Lajaunie. Plaintiffs cannot help but to italicize the word *Defendants* to underscore the difference. That, at a time when Defendants' lawyers had already made a Motion to Withdraw, and when Defendants' attorney Jeffrey Meyer made a clear statement in Court that there were unresolvable differences between Lajaunie and the firm that was making working together progressively difficult. Despite the predictable outcome, Plaintiffs deliberately chose the list prepared by those lawyers, rather than the gold standard of Lajaunie's original business records. Plaintiffs' expediency in this matter has had grave unjust consequences, to this day. But their motivations are being revealed further down.

16. In Plaintiffs' statement (4) above, a whole paragraph is dedicated to justifying how, despite clear proof and understanding of the impossibility of these employees to be class members, "Plaintiffs used the class list that Defendants previously provided to Plaintiffs", in an obstinate position –or maneuver- to keep the same mistake perpetuating, over the last nearly three years of court proceedings. Despite the obvious and ethical choice to be

made in using Lajaunie's original records, Plaintiffs perpetuate the same mistakes, aggravating both claimants' misallocations, and consequences onto Lajaunie for the last two and half years. Defendant's Objections are correct, and now that Plaintiffs have admitted to their flawed original choice as a basis for their calculations, at the very least proper fact finding should be implemented by the Magistrate Judge.

17. In Plaintiffs' statement (5) above, Lajaunie does concur: I am trying, now that Plaintiffs have shown that they knowingly used deeply flawed documentary backup instead of Lajaunie's original records, to avoid a Final Judgment as punishment. Only a proper documented trial will determine Defendants' liabilities.

Lajaunie, appearing Pro se in this matter, has found that an appeal may only be prepared and filed by a lawyer. An appeal of the potential Final Judgment, however well documented and supported at this stage, is still an expense that Lajaunie cannot afford, but will have to go deeper in debt in order to have prepared and submitted. Therefore, Defendant Lajaunie respectfully request that the Court grants his Motion for Reconsideration and for Relief, so that this matter go to an equitable trial.

18. In Plaintiffs' statement (6) above, the reason of Plaintiffs' expediency are finally revealed and admitted: their lawyers are concerned about "getting paid". It appears that, because they estimated that they may have been working with little chance of getting compensated for their professional time, improper shortcuts may have been chosen in order to save on legal time.

Shortcuts and calculated mistakes based on monetary saving considerations, with financial consequences for hundreds of claimants and a $6 million Decision *as punishment for an action that was not committed,* is not acceptable nor permissible under any legal standard and legal theory. In light of past Decisions providing the legal foundations for a Decision Reversal in this Default, Defendant Lajaunie submits that Plaintiffs' sentence: "and that Plaintiffs' counsel be required to spend additional uncompensated time going through boxes of Defendant's documents to rectify fabricated deficiencies" is a clear and undeniable admission that adds the cornerstone to Lajaunie's Plea for a Reversal of the Default.

19. In the same sentence, the use of the singular "Defendant's", again points to, and admits, that Lajaunie did deliver the boxes of business records. This is in contrast to Plaintiffs using the plural "Defendants' list", to describe the list given by the departing law firm.

20. Moreover, Defendant Lajaunie submits that special attention should be paid to the end of the sentence: "to rectify fabricated deficiencies". It may be interpreted that Plaintiffs may be admitting to *fabricated deficiencies.* Defendant Lajaunie submits that being aggravated by the prospect of working without being compensated leading to expedient yet wholly consequential shortcuts in one issue, but "fabricated deficiencies" is an issue that is in another realm of responsibility, opening multiples questions.

**Conclusion for Defendant's Motion for Reconsideration and for Relief from an Order**

21. The foregoing clearly establishes that:

   a. Defendant Lajaunie did deliver the boxes of original records to Plaintiffs timely, as directed by his lawyers at the time.

   b. Plaintiffs chose to ignore this material because of their concerns about "not being compensated" for the extra work it would take to analyze these original records.

   c. Instead, Plaintiffs chose to use a list prepared from unsubstantiated documents by a new hire in Defendants' departing law firm.

   d. Despite Defendant Lajaunie reiterating these facts for almost three years, Plaintiffs chose to push these flawed documents through the different stages of these proceedings.

   e. The consequences of doing so alter the allocations of hundreds of claimants, and subjects Defendant Lajaunie to a wholly unjust possible $6,000,000 judgement against him personally, because Plaintiffs misrepresented to the Court that the requested discovery documents had not been provided.

   f. Defendant Lajaunie has been punished by the Court by a Default with a possible $6,000,000 judgment because Plaintiffs misled the Court as to the timing of the delivery of boxes, and their content.

   g. In reality, Defendant Lajaunie had timely delivered the requested documents as required, and as directed by Defendants' lawyers.

h.  Consequently, Plaintiffs, in their March 29, 2019 letter statements, dispel the foundations to the Court's Order dated August 10, 2016, as recalled by Plaintiffs in their March 14, 2019 letter to the Court: "on August 10, 2016 this Court ordered, adjudged, and decreed a default judgment against Defendants on all of Plaintiffs' remaining claims as a result of Defendants' willful noncompliance with the Court's discovery orders and referred the action to Magistrate Judge Sarah Netburn for an inquest on damages."

22. Based on the foregoing, Defendant Lajaunie submits to the Court a renewed Motion for Reconsideration or Reversal. Please see Exhibit B, Lajaunie's first Letter for Reconsideration dated August 15, 2017.

23. In support of his Motion, Defendant Lajaunie provides the following jurisprudence cases:

a.  Funk v. Belneftekhim, 861 F.3d 354 (2017), Exhibit C

b.  Goodyear Tire & Rubber v. Haeger, 137 S.Ct. 1178 (2017), Exhibit D

c.  Virginia Properties, LLC v. T-Mobile Northeast LLC, 2017 WL 3197539, Exhibit E

d.  U.S. v. Uccio, 940 F.2d 753 (1991), Exhibit F

24. Plaintiffs' letter dated Friday, March 29, 2019 provides new information, new facts, and new admissions from Plaintiffs. Through them, Defendant Lajaunie's claims and assertions made since July 2016 in Court and in letters and Motions to the Court since, have now been admitted by Plaintiffs.

At the core of the Default against Lajaunie personally, are two elements:

a.  Plaintiffs' assertion that Defendants had not provided discovery as ordered by the Court. Plaintiffs now confirm that Defendant had, in fact, delivered the discovery documents as Ordered.

b.  The Court's perception that Defendant Lajaunie had *willfully* not provided the final discovery documents as Ordered. Defendant Lajaunie can now show the Court that his assertions were correct: discovery was provided as Ordered, and Defendant Lajaunie should not be punished personally through being found personally liable for the Default under the FLSA and NYSLL statutes.

Defendant respectfully submits to the Court that his Motion for Reconsideration and for Relief from an Order, pursuant to Rule 60(b) should be granted.

Respectfully submitted,

Dated: Monday, April 1, 2019

Philip Lajaunie

PL@FirstAdminInc.com

To the Court:

**Adam Margulies:** CA02_RJSchambers@ca2.uscourts.gov

To the Plaintiffs:

**Maimon Kirschenbaum:** Maimon@jk-llp.com

**Denise Schulman:** Denise@jk-llp.com

STATE OF WYOMING     )

                     ) SS

COUNTY OF TETON      )

Philip Lajaunie, under penalty of perjury, affirms that to the best of his knowledge the aforementioned statements are true.

DATED: April 1, 2019

```
BRIAN CAREW - NOTARY PUBLIC
County of              State of
Teton                  Wyoming
My Commission Expires March 22, 2020
```

_____
Notary Public

My commission expires: 3/22/2020

# EXHIBIT A

# JOSEPH & KIRSCHENBAUM LLP

**Attorneys at Law**

Charles Joseph
D. Maimon Kirschenbaum
Denise A. Schulman
Josef Nussbaum
Lucas C. Buzzard

32 Broadway, Suite 601
New York, NY 10004
Phone (212) 688-5640
Fax (212) 688-2548
www.JK-LLP.com

March 29, 2019

**VIA ECF AND E-MAIL**

Honorable Richard J. Sullivan
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

          Re:      **Murphy v. LaJaunie**
                   **No. 13 Civ. 6503 (RJS)**

Dear Judge Sullivan:

          Together with the Law Offices of Jeffrey E. Goldman, we are class counsel in the above-referenced action. I write to briefly respond to Defendant Philippe Lajaunie's letter in opposition to Plaintiffs' proposed judgment dated March 28, 2019 ("3/28/19 Letter"). With one exception (the identification of a duplicate entry), the objections raised in the 3/28/19 are meritless. In a clear attempt to stall and delay judgment, most of the objections address matters that have previously been litigated and decided by this Court. For the reasons set forth below, we respectfully request that the Court reject Lajaunie's objections and enter judgment.

          Lajaunie's objection to the interest calculation on the spread of hours damages fundamentally misunderstands how interest is to be calculated. (3/28/19 Letter at 3.) Pre-judgment interest is properly calculated from the damages mid-point to the date of judgment. (Dkt. No. 325 at 21.) That is precisely how Plaintiffs calculated interest on their spread of hours claims. (Dkt. No. 332-2.)

          Lajaunie objects to the combined allocation of N.Y. Lab. L. § 196-d and spread of hours damages. (3/28/19 Letter at 2-3.) This objection is groundless. In their inquest submissions, Plaintiffs proposed this very method of allocation. (Dkt. No. 296-16 at 15.) Judge Netburn recommended the use of this allocation method (Dkt. No. 325 at 22), and this Court subsequently ordered the implementation of this allocation method. (Dkt. No. 328 at 5.) Accordingly, all of Lajaunie's objections that are based on this allocation method (his points 1 and 2.a. regarding Exhibit 3) should be rejected, as they have already been litigated. (3/28/19 Letter at 2-3.)

          Lajaunie's objections to the inclusion of certain class members (his points 2.b. and 2.c. regarding Exhibit 3) are also meritless. (3/28/19 Letter at 3.) To calculate the damage allocation, Plaintiffs used the class list that Defendants previously provided to Plaintiffs, subject to certain adjustments and additions that have been described in prior submissions. In other words, the people Lajaunie now seeks to exclude from the class are people who *Defendants* previously

1

determined were in fact class members. That class list was referenced repeatedly in Plaintiffs' inquest papers, and the list itself (with the exception of contact information) was submitted with Plaintiffs' inquest papers as Exhibit 31. (Dkt. No. 296-11.)  Any objection to the composition of the class (however baseless) should have been made in the context of the inquest, not now, in a last ditch attempt to forestall judgment.

Lajaunie's contention that Les Halles Park Avenue bartenders should be excluded from the class (3/28/19 Letter at 3, 4) was previously briefed, and the Court rejected that argument. (*See* Dkt. No. 167 at 17-18 (Defendants' argument that Les Halles Park Avenue bartenders were not affected by the inclusion of maître d's in the tip pool); Dkt. No. 179 at 4-6 (Plaintiffs' response to Defendants' argument regarding bartenders); Dkt. No. 196 at 2 (Order granting class certification of, *inter alia*, N.Y. Lab. L. § 196-d claims and including bartenders in the class definition); Dkt. No. 219 (Order approving class notice (Dkt. No. 217-1) addressed to, *inter alia*, bartenders).)  Accordingly, Lajaunie's points 4 and 5 regarding Exhibit 3, in which he argues that Les Halles Park Avenue bartenders should be excluded from the class, should be rejected.

Lajaunie has also identified potential duplicate entries that appeared in the original class list produced by Defendants and now appear in the settlement allocation: Lazaro Calel Tzarax and Lazaro Calel Tarax. (3/28/19 Letter at 3-4.)  Lajaunie is likely correct that these entries are for the same person. Accordingly, we propose that in the event of a monetary recovery in this case, these two entries be consolidated into a single entry using the longer work period of February 2, 2010 to April 9, 2013 (from the Tzarax entry), and the N.Y. Lab. L. § 196-d and spread of hours allocation listed for Lazaro Calel Tarax be re-allocated on a *pro rata* basis among the other Les Halles Park Avenue class members.

With the exception of the Tarax/Tzarax issue, Lajaunie has made meritless objections and sought to relitigate already-resolved issues in the 3/28/19 Letter. It is clear that Lajaunie is seeking to avoid the finality of the Court's previous decisions and the finality of a judgment. To be sure, Lajaunie concludes his submission by requesting that this matter be referred *back* to the Magistrate Judge and that Plaintiffs' counsel be required to spend additional uncompensated time going through boxes of Defendants' documents to rectify fabricated deficiencies[1]. Lajaunie was held in default on August 10, 2016, roughly two and a half years ago. (Dkt. No. 260.)  We respectfully request that Lajaunie's continued delay tactics be rejected, and judgment entered in accordance with Plaintiffs' March 14, 2019 submission.

We thank the Court for its attention to this matter.

Respectfully submitted,

Denise A. Schulman

cc: Philippe Lajaunie

---

[1] Of course, this request further ignores the fact that documents from large periods of time are missing from the boxes of documents that Defendants produced to Plaintiffs, making it impossible to compile comprehensive and accurate information from those documents.

# EXHIBIT B

August 15, 2017

Honorable Richard J. Sullivan
United States District Court Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

Re:    Ethan Murphy et al. v. Philippe Lajaunie, et al.
       Index No. 13-cv-06503 (RJS)

Dear Judge Sullivan:

Pursuant to Rule 54(b), I most respectfully seek reconsideration of your Honor's decision and order (document 260, filed 08/10/16), which (i) sanctioned me for discovery problems, (ii) vacated the prior decision which was in my favor, as it had found no basis for my personal liability on certain matters, and (iii) defaulted me on personal liability. I recognize I have sought this relief before, but I believe the developing facts and the following recent decisions support this request at this time.[1]

Rule 54(b) permits the Court to revise its order, particularly in light of recent controlling authority from the Second Circuit. *See, e.g., Starbucks Corp. v. Wolf's Borough Coffee, Inc.,* 736 F.3d 198, 208 (2d Cir. 2013) ( Rule 54(b) grants a district court authority to revise an interlocutory order at any time before the entry of final judgment for "cogent and compelling reasons such as an intervening change of controlling law"). In *in re Nassau Ct. Strip Search Cases,* 639 Fed App'x 747 (2d Cir. 2016), the Second Circuit recently affirmed a district court decision to grant Rule 54(b) reconsideration and to reverse a portion of its liability judgment – more than five years after that judgment was entered – in light of a new decision from the United States Supreme Court. *See also United States v. Uccio,* 940 F.2d 753 (2d Cir. 19911) (event after mandate issues, district court is free to revisit a pre-appeal decision so long as that decision was not reviewed or decided on appeal). Indeed, in *Virginia Properties, LLC v. T-Mobile Northeast LLC,* ___F.3d ___, 2017 WL 3197539, No. 16-2973 (2d Cir. July 28, 2017), the Second Circuit, relying on a recent decision in *Goodyear*

---

[1] I have not been able to, and cannot afford, to retain counsel to appear in this case. With my limited funds, now exhausted, I did retain counsel to help me try to settle this case with the Class, and we reached a term sheet, but when that fell through I had no funds to continue paying that counsel. That counsel was, however, kind enough to help me with legal research and this letter, but at this time I cannot pay counsel for this or any work in this case.

*Tire & Rubber Co. v. Haeger,* 137 S.Ct. 1178, 1183-84 (2017), reversed a sanctions order imposed long before *Goodyear.*

Two recent Second Circuit decisions apply to my situation and clarify that, on these facts, the order to sanction me should be vacated. In *Virginia Properties,* the Second Circuit vacated discovery sanctions, including dismissal and fees, as an abuse of discretion, because it was left with the firm conviction that a mistake had been committed. The Court found that the moving party had wrongly convinced the District Court that the wrongdoing party had committed a fraud on the court, which finding was not supported by the whole record. Although there was no dispute that there was a failure to produce relevant documents, which should have been produced early in the litigation (which the District Court found was in "bad faith"), key to the Second Circuit's decision was that the blame for the disclosure failures may well have lied with the sanctioned party's attorneys and that the District Court misunderstood the significance of the undisclosed documents. Just as in my case, the sanctioned party there had provided documents to his attorneys to respond to discovery demands, which those attorneys did not produce, and the relationship with those attorneys had soured. In the end, the Court vacated and remanded.

In *Funk v. Belneflekhim,* 861 F.3d 354, 2017 WL 2801783, No. 15-3372 (2d Cir. June 29, 2017), the Second Circuit reversed an order granting similar discovery sanctions. The Court held that the severe discovery sanctions of default or striking a sovereign immunity defense were improper when the court has available other alternatives, even though the lower court had issued multiple warnings after defendants had repeatedly disobeyed discovery orders and prior monetary sanctions had failed . Despite repeated, adequate warnings and an opportunity to be heard, the Court, relying on its own precedent, reversed the sanction of striking a defense as an abuse of discretion because such a harsh sanction is permitted only in "extreme circumstances" and "after consideration of alternative, less drastic sanction." At p. 370. Concededly, this case involved not permitting a court to establish jurisdiction through sanctions, but I believe its discussion is relevant here.

In *Goodyear Tire,* 137 S.Ct. at 1183-1184, the Supreme Court also made clear that "a federal court's inherent authority to punitively sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees" is extremely limited and requires "procedural guarantees applicable in criminal case, such as a 'beyond a reasonable doubt' standard of proof." *Id.* at 1186.

In my case, the Court conducted no evidentiary hearing although (i) I explained that I had no staff and was operating under clear constraints, without clear instructions or help from counsel; (ii) I asserted that I had given large volumes of records to my counsel or made them available to plaintiffs, and clearly disputed that I had personally failed to provide documents; (iii) I had insisted that my attorneys were at fault for failing to assist me, failing to produce, and failing to properly explain the facts to the Court, which raised a clear question as to whether my attorneys or I was at fault.

This dispute as to who was at fault and the failure to make detailed findings of fact, which could only be made after a proper evidentiary hearing on fair notice to me, was a key reason for reversal in *Virginia Properties.* The Court here held no hearing and could not make any findings as to fault, but rather stated it did not matter, because I was bound even if my attorneys were at fault.

Here, there were also several other fair and reasonable alternatives to defaulting me on the merits, including the use of discovery sanctions, proof sanctions, or simply vacating without default.

Finally, the error is compounded by the fact that at the time of the Court's sanctions order, I was *pro se*, since the former firm representing me (who answered to the insurer, and I had not had anything to do with selecting or directing it):

- Had rarely, if ever, followed my requests and instruction;
- Had largely stopped working because the insurance proceeds had run out;
- Had been allowed to withdraw by the Court and was no longer representing me;
- Was in conflict with my interests and could not represent me in any event.

I recognize that at the time of the sanction order and default, the Court felt put upon and was upset, but there were factual disputes, and I was attempting to show the Court, as a *pro se* litigant with no help from conflicted, withdrawing counsel, that the discovery mistakes were the fault of my former, conflicted attorneys, who had exhausted the insurance policy limits and had not followed my instructions. The Court took no evidence and gave me no opportunity to find an unconflicted lawyer to represent me on the sanctions motions and present the facts.

As a result, the consequences have been a disaster for me and for the Class, which I do not think the Court intended, and which are inequitable under all the circumstances.

Since the default, rather than waste money continuing to fight the default further, I have tried desperately

- to keep Les Halles operating in order to serve as a foundation for a Bankruptcy Plan that will benefit the Class and other creditors;
- to offer voluntarily my few remaining liquid funds to further support such a Plan.

This case, however, has destroyed Les Halles and the landlord has taken back the space, temporarily preventing me from continuing a source of revenue to help the Class. I am trying to find another location or even a partnership (running operation which could use a known brand name to boost business). In addition, I am insolvent, barely have liquid funds to function, and my assets (which I have disclosed to Class counsel) are heavily liened. I do not think the Court intended to drive me into personal bankruptcy.

Under all of these equities and the controlling law of discussed above, I submit that the sanctions order should be reconsidered and vacated, and at a minimum, the Court should hold argument and a hearing.

Respectfully,

Philip Lajaunie

Cc: (by email)
Maimon Kirshenbaum, Esq.
Jeffrey Goldman, Esq.

# EXHIBIT C

Funk v. Belneftekhim, 861 F.3d 354 (2017)

861 F.3d 354
United States Court of Appeals,
*Second Circuit.*

**Vladlena FUNK, Emanuel Zeltser,
Plaintiffs–Appellees,
v.
BELNEFTEKHIM, aka Concern Belneftekhim,**
Belneftekhim USA, Inc., **Defendants–Appellants.**

Docket No. 15-3372-cv
|
**August Term, 2016**
|
Argued: December 9, 2016
|
*Decided: June 29, 2017*

**Synopsis**
**Background:** United States citizens who were abducted
from London and detained in Belarus by authorities of
that country brought state court action against Belarusian
entities, asserting claims for assault and battery,
intentional infliction of emotional distress, and false
imprisonment, for their alleged roles in the citizens'
abduction and detention. Entities removed the action to
federal court. The United States District Court for the
Eastern District of New York, Brian M. Cogan, J., 2015
WL 6160247, entered discovery sanctions order requiring
defendants to pay earlier monetary sanctions that had
accrued and striking their foreign sovereign immunity
defense. Entities filed interlocutory appeal.

**Holdings:** The Court of Appeals, Reena Raggi, **Circuit
Judge,** held that:

[1] Court of Appeals had jurisdiction, under collateral
order doctrine, to review district court's order sanctioning
Belarusian entities;

[2] district court did not abuse its discretion in ordering
limited jurisdictional discovery;

[3] district court did not abuse its discretion in imposing
discovery sanctions requiring Belarusian entities to pay
monetary sanctions and litigation-expense sanctions
imposed by prior order; and

[4] district court abused its discretion in imposing

discovery sanctions striking Belarusian entities' foreign
sovereign immunity defense.

Affirmed in part; vacated and remanded in part.

**West Headnotes (18)**

[1]    **Federal Courts**
       ↪ Interlocutory and Collateral Orders

       "Collateral order doctrine" allows interlocutory
       appeals from the small class of orders that: (1)
       conclusively determine the disputed question;
       (2) resolve an important issue completely
       separate from the merits of the action; and (3)
       are effectively unreviewable on appeal from a
       final judgment.

       Cases that cite this headnote

[2]    **Federal Courts**
       ↪ Sanctions

       Court of Appeals had jurisdiction, under
       collateral order doctrine, to review district
       court's order sanctioning Belarusian entities by
       striking their foreign sovereign immunity
       defense under the Foreign Sovereign Immunities
       Act (FSIA) for their persistent failure to provide
       jurisdictional discovery in United States
       citizens' assault and battery action arising from
       incident in which the citizens were abducted
       from London and detained in Belarus by
       authorities of county; in striking the immunity
       claim the district court removed the claim from
       the case, the entities' professed entitlement to
       immunity was an issue distinct from the merits
       of the citizens' underlying claims, and denial of
       immunity was effectively unreviewable after
       final judgment because the entities would be
       forced to litigate that case to reach judgment
       and, thus, lose the immunity to which they
       claimed to be entitled. 28 U.S.C.A. § 1602 et
       seq.; Fed. R. Civ. P. 37.

Funk v. Belneftekhim, 861 F.3d 354 (2017)

Cases that cite this headnote

[3]     **Federal Courts**
        ↶Immunity

        A district court's order striking a defendant's
        sovereign immunity claim under the Foreign
        Sovereign Immunities Act (FSIA) can be
        immediately appealable as a final order where a
        party asserts not merely immunity from
        judgment, but immunity from the burden of
        **having to defend the claim at all.** 28 U.S.C.A. §
        1602 et seq.

        Cases that cite this headnote

[4]     **Federal Courts**
        ↶Immunity

        **Collateral order doctrine can apply when foreign
        sovereign immunity is conclusively denied to a
        party who invokes it to avoid the burden of
        litigation;** it is not limited to foreign states
        *denied immunity under a Foreign Sovereign
        Immunities Act (FSIA) exception.* 28 U.S.C.A.
        § 1602 et seq.

        Cases that cite this headnote

[5]     **Federal Courts**
        ↶Discovery sanctions

        Court of Appeals accords deferential review to a
        District Court's imposition of discovery
        sanctions, and will reverse only for abuse of
        **discretion, which will not be identified absent an
        error of law, a clearly erroneous finding of fact,
        or a decision that cannot be located within the
        range of permissible options available to the
        district court.** Fed. R. Civ. P. 37.

        Cases that cite this headnote

[6]     **Federal Civil Procedure**
        ↶Failure to respond;  sanctions
        **Federal Courts**
        ↶Discovery sanctions

        **In imposing discovery sanctions, as well as in
        reviewing a sanctions order for abuse of**
        discretion, federal courts properly consider
        various factors, including: (1) the willfulness of
        the non-compliant party or the reason for
        noncompliance; (2) the efficacy of lesser
        sanctions; (3) the duration of the period of
        noncompliance; and (4) whether the
        non-compliant party had been warned of the
        **consequences of noncompliance.** Fed. R. Civ. P.
        37.

        Cases that cite this headnote

[7]     **Federal Civil Procedure**
        ↶Jurisdictional discovery

        A district court is typically within its discretion
        to order jurisdictional discovery where a
        plaintiff has made out a prima facie case for
        jurisdiction.

        Cases that cite this headnote

[8]     **International Law**
        ↶Evidence of immunity, and fact questions

        **In the Foreign Sovereign Immunities Act (FSIA)**
        context, a defendant asserting sovereign
        immunity to defeat jurisdiction has the initial
        burden to present a prima facie case that it is a
        **foreign sovereign.** 28 U.S.C.A. § 1602 et seq.

        Cases that cite this headnote

[9]     **Federal Civil Procedure**
        ↶Jurisdictional discovery

        District court did not abuse its discretion in

ordering limited jurisdictional discovery as to Belarusian entities' ownership and structure in United States citizens' action against the entities for their alleged role in the citizens' abduction from London and detention in Belarus by authorities of that country; while the Belarusian laws and related material produced by the entities, viewed most favorably to them, supported their argument that the entities were organs of Belarus, as would support immunity under Foreign Sovereign Immunities Act (FSIA), citizens provided adequate contrary evidence in form of expert opinion and admissions attributed to the entities' own agents to give rise to colorable factual dispute on the that issue, and the district court's discovery order was appropriately circumspect in limiting inquiry to the specific facts that were crucial to immunity determination. 28 U.S.C.A. § 1602 et seq.

Cases that cite this headnote

[10]     **Federal Civil Procedure**
         ⌐Jurisdictional discovery
         **International Law**
         ⌐Domestic Effect of Foreign Acts and Laws

The "act-of-state doctrine," which precludes the courts of one state from questioning the validity of public acts performed by other sovereigns within their own borders, did not preclude district court from ordering jurisdictional discovery as to ownership and structure of Belarusian entities, which claimed to be arms of the state entitled to immunity under Foreign Sovereign Immunities Act (FSIA), in United States citizens' action against the entities for their alleged role in the citizens' abduction from London and detention in Belarus by authorities of that country; although doctrine could preclude the citizens from challenging the validity of Belarusian laws the entities proffered to support their immunity claim, it did not preclude citizens from disputing the completeness of the entities' legal proffer or the accuracy of their translations and, on that basis, questioning whether the submitted provisions of Belarusian law said what the entities maintained they said. 28 U.S.C.A. § 1602 et seq.

Cases that cite this headnote

[11]     **Federal Civil Procedure**
         ⌐Failure to respond; sanctions

The length of a party's defiance of a discovery order can inform the propriety of a particular sanction. Fed. R. Civ. P. 37.

Cases that cite this headnote

[12]     **Constitutional Law**
         ⌐Penalties, fines, and sanctions in general

Due process requires that courts provide notice and an opportunity to be heard before imposing any kind of sanctions; generally, such notice should alert the party to the particular sanction under consideration. U.S. Const. Amend. 5.

Cases that cite this headnote

[13]     **Federal Civil Procedure**
         ⌐Failure to respond; sanctions

District court did not abuse its discretion in imposing discovery sanctions on Belarusian entities for failure to comply with discovery orders, requiring the entities to pay monetary sanctions that had accumulated under prior discovery sanctions against the entities, as well as litigation-expense sanctions imposed by prior sanctions, in United States citizens' action against the entities based on their alleged role in the citizens' abduction from London and detention in Belarus by authorities of that country; entities wilfully failed to comply with district court's two discovery orders for a total of three months, in first sanctions order the district court warned that if the entities continued non-compliance with discovery, further sanctions were possible, and given that prior sanctions had not induced compliance, there was no reason to think any lesser sanction would have been more effective. Fed. R. Civ. P.

Funk v. Belneftekhim, 861 F.3d 354 (2017)

37.

Cases that cite this headnote

[14]     **Federal Civil Procedure**
         ⇌Failure to respond;  sanctions

         District court abused its discretion in imposing
         discovery sanctions on Belarusian entities,
         striking their sovereign immunity defense, for
         failure to comply with discovery orders in
         United States citizens' action against the entities
         based on the entities' alleged role in the citizens'
         abduction from London and detention in Belarus
         by authorities of that country; sanctions risked
         possibility that district court would exercise
         jurisdiction where none existed, and alternative
         sanctions were available. 28 U.S.C.A. § 1602 et
         seq.; Fed. R. Civ. P. 37(b).

         1 Cases that cite this headnote

[15]     **International Law**
         ⇌Immunity

         Sovereign immunity is an element of subject
         matter jurisdiction under the Foreign Sovereign
         Immunities Act (FSIA). 28 U.S.C.A. § 1602 et
         seq.

         Cases that cite this headnote

[16]     **Federal Courts**
         ⇌Limited jurisdiction;  jurisdiction as
         dependent on constitution or statutes

         Federal courts are not empowered to confer
         subject-matter jurisdiction on themselves.

         Cases that cite this headnote

[17]     **Federal Courts**
         ⇌Limited jurisdiction;  jurisdiction as
         dependent on constitution or statutes

         Article III functions as a restriction on federal
         power, and contributes to the characterization of
         the federal sovereign. U.S. Const. art. 3, § 2, cl.
         1.

         Cases that cite this headnote

[18]     **Federal Courts**
         ⇌Controversies between foreign parties

         Article III jurisdiction extends to actions against
         foreign states. U.S. Const. art. 3, § 2, cl. 1.

         Cases that cite this headnote

***357** Appeal from the United States District Court for the
Eastern District of New York

**Attorneys and Law Firms**

KENNETH A. CARUSO (Christopher D. Volpe, **on the
brief**), White & Case, LLP, New York, New York, for
Defendants-Appellants.

EMANUEL ZELTSER, Sternik & Zeltser, New York,
New York, for Plaintiffs-Appellees.

**Before:** Calabresi, Raggi, Lynch, **Circuit Judges.**

**Opinion**

Reena Raggi, **Circuit Judge:**

In this action, originally filed in New York State court,
plaintiffs Emanuel Zeltser and Vladlena Funk sue
defendants Concern Belneftekhim ("BNTK") and
Belneftekhim USA, Inc. ("BUSA") for their alleged roles
in plaintiffs' 2008 abduction from London and their
prolonged detention in Belarus by authorities of that
country. After defendants removed the case to the United
States District Court for the Eastern District of New York
(Brian M. Cogan, *Judge*), they moved to dismiss based in

**Funk v. Belneftekhim, 861 F.3d 354 (2017)**

part on foreign sovereign immunity. *See* Foreign Sovereign Immunities Act of 1976 ("FSIA"), **\*358** Pub. L. No. 94–583, 90 Stat. 2891 (codified at 28 U.S.C. §§ 1330, 1332(a)(2)–(a)(4), 1391(f), 1441(d), **and** 1602–1611). Defendants here appeal from the October 20, 2015 order requiring defendants to pay earlier monetary sanctions that had accrued and striking their foreign sovereign immunity defense as a sanction pursuant to Fed. R. Civ. P. 37(b) for their persistent failure to provide jurisdictional discovery. Defendants argue that the challenged order exceeded the district court's discretion, particularly because their submissions of Belarusian law *established their sovereign immunity defense as a matter* of law.

Plaintiffs respond that we lack jurisdiction to consider this interlocutory appeal. In any event, they maintain that the challenged sanction order was within the district court's discretion because defendants' claim of sovereign immunity raises unresolved questions of fact on which they were entitled to jurisdictional discovery.

We have jurisdiction to review this appeal pursuant to the collateral order doctrine. On such review, we conclude that the district court acted within its discretion in ordering limited jurisdictional discovery and in sanctioning defendants for failing to comply with that order. At the same time, however, we conclude that, to the extent the challenged October 20, 2015 order not only required defendants to pay an earlier accrued monetary sanction but also struck their sovereign immunity claim in its entirety, it exceeded the district court's discretion. The *latter sanction risked the district court's assumption of* jurisdiction where it may, in fact, have been lacking, something the court was not empowered to do, particularly where, as here, alternative sanctions are available. Accordingly, we affirm the challenged order generally, vacating only that part striking defendants' foreign sovereign immunity claim, and we remand the case to the district court for further proceedings consistent with this opinion.

## I. Background

### A. The Abduction Giving Rise to this Action
The following facts are drawn from plaintiffs' first amended complaint, which was operative at the time of the challenged rulings.

Plaintiff Zeltser, a United States citizen, represented a group of investors who, in the late 1990s and early 2000s, purchased a block of stock in BNTK, a Belarusian petrochemical cooperative, and secured an option to acquire a controlling interest in that concern. BUSA is a Massachusetts corporation, which acts as BNTK's representative in the United States.

In 2006 and 2007, the United States imposed sanctions on members of the Belarusian government, including head of state Alexander Lukashenko, and on certain Belarusian entities, including defendants.[1] Soon thereafter, defendants abrogated their agreement with Zeltser's clients and refused to compensate them for the breach. Plaintiffs threatened legal action, and a series of meetings ensued as the parties attempted to resolve their dispute.

**\*359** In March 2008, defendants' representatives met twice with Zeltser and his assistant Funk in New York City to explore settlement. After Zeltser and Funk declined to travel to Belarus for a further meeting, the parties convened in London on March 11, 2008. There, plaintiffs assert that they were drugged, kidnapped, and, ultimately, flown to Belarus under the alleged supervision of defendants' representatives.

In Belarus, plaintiffs were placed in a government detention facility where they were tortured and denied adequate food, water, and medicine. Defendants' representatives allegedly observed and directed this mistreatment in an effort to coerce Zeltser to surrender documents relating to his clients' BNTK investments and to convince those clients to renounce their stake in BNTK. Funk was also pressured to sign a confession implicating Zeltser in economic espionage. At some point during plaintiffs' captivity, Belarusian authorities issued a *statement declaring that plaintiffs had been convicted of* attempted economic espionage.

Meanwhile, a week after plaintiffs' abduction, New York's U.S. Senator Charles Schumer alerted the State Department to the abduction and requested aid in procuring plaintiffs' release. Over the next year, plaintiffs' situation attracted the attention of several private organizations as well as the national media. Funk was released on March 20, 2009, approximately one year after her abduction. Only after a United States congressional delegation traveled to Belarus to demand Zeltser's release was he too freed from captivity on June 30, 2009.

### B. The Instant Lawsuit

#### 1. The Initial Pleadings and Motion To Dismiss

Plaintiffs initially filed this action on July 12, 2012, in

New York State Supreme Court, demanding $140 million in damages for alleged assault and battery, intentional infliction of emotional distress, false imprisonment, interference with a contractual relationship and prospective economic advantage, conversion, and *prima facie* tort. On December 8, 2013, with defendants having failed to answer, plaintiffs moved for a default judgment. Before any action was taken on the motion, defendants appeared and, on January 16, 2014, removed the case to federal court and there moved for dismissal on the grounds that both subject-matter and personal jurisdiction were lacking.

Defendants invoked the FSIA to challenge subject–matter jurisdiction. *See* 28 U.S.C. § 1604 (providing that foreign state shall be immune from jurisdiction in federal and state courts except as provided in 28 U.S.C. §§ 1605–1607). To support their immunity claim, defendants relied on plaintiffs' own initial complaint, which alleged that defendants were "the Belarusian petrochemical monopoly owned by and controlled by the government of Belarus, Lukashenk[o], and other members of the Belarusian government." J.A. 21.

In opposition, plaintiffs argued that defendants had failed to carry their burden to make a *prima facie* showing that BNTK was indeed an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b). Plaintiffs also renewed their motion for default judgment or, in the alternative, urged that the foreign sovereign immunity issue be deferred to trial because defendants' claim of foreign state status presented disputes of fact.

### 2. First Discovery Order

On December 31, 2014, the district court ruled both that *defendants' motion to dismiss and plaintiffs' motion for default *360 judgment* were premature in light of factual questions on the threshold jurisdictional issue of whether BNTK qualifies as an agency or instrumentality of a foreign state. The court ordered limited jurisdictional discovery to allow the parties "to obtain the information necessary to supplement their motions or proceed to a hearing." J.A. 124.[2]

### 3. Discovery and Further Motion Practice

On the January 30, 2015 deadline set by the district court, plaintiffs submitted a proposed discovery plan. Rather than submitting a discovery plan, however, Defendants requested leave to renew and supplement their dismissal motion with the results of further investigation in Belarus. Given the parties' disagreement over the path forward, the district court itself set a discovery schedule, which provided for the parties to supplement their motions *after* the ordered discovery.

Instead, on March 23, 2015, defendants supplemented their motion to dismiss by filing a translated declaration from Dmitry Gvozdev ("Gvozdev Declaration"), an employee in BNTK's legal department, to which were attached purported provisions of Belarusian law. Defendants argued that these provisions convincingly established BNTK's status as an agency or instrumentality of Belarus under either the organ or ownership prongs of 28 U.S.C. § 1603(b)(2). The Gvozdev Declaration pointed, *inter alia*, to BNTK's charter declaring that its assets were the property of Belarus, to various resolutions of Belarus's Council of Ministers stating that BNTK was involved in the administrative management of Belarus's petrochemical industry, and to a presidential decree declaring that "concerns" such as BNTK were part of the "system of Government" in Belarus. J.A. 152–53. The Declaration also stated that BNTK's chairperson is appointed by the Belarusian government and that the number of its employees, their salaries, and its budget are all set by that government. Defendants further submitted a United States Congressional Research Service report on Belarus that referred to BNTK as "state-owned." *Id.* at 145.

On April 28, 2015, plaintiffs filed an affidavit of Alexander Fishkin ("Fishkin Affidavit"), an attorney admitted to practice law in Belarus with avowed experience in translation. That affidavit states that defendants' production of Belarusian laws is "incomplete" and cannot be deemed controlling because unpublished decrees known as "Closed Circulars" can "super[s]ede published statutes" in Belarus. *Id.* at 297, 309 (internal quotation marks omitted). Fishkin further maintained that defendants' translations of Belarusian laws were "inaccurate, sometimes nearly to the point of changing their meaning to the opposite," *id.* at 297; *see, e.g., id.* at 299 (discussing defendants' mistranslation of "licensor" as "lessor"); that their submission did not, in any event, establish direct ownership of BNTK by Belarus, *see id.* at 302; and that BNTK in fact "consist[s] of two components: commercial and non-commercial," with the former being "owned by individual corporate members ..., which are joint-stock companies, including publicly traded companies" that "sell equity investments to private investors," *id.* at 298, 306.

In a joint letter dated June 3, 2015, the parties summarized their ongoing discovery disputes, with plaintiffs accusing defendants of "object[ing] to virtually every **\*361** interrogatory and document request" and "declin[ing] to produce any person for deposition." *Id.* at 315. Plaintiffs maintained that further discovery was needed on multiple grounds, including "prov[ing] the existence of alter ego relationships" as between defendants and Lukashenko and as between BNTK and BUSA. *Id.* at 316. Plaintiffs also sought discovery to establish the commercial activity exception to foreign sovereign immunity and to show that BNTK is, in fact, a commercial entity owned by its private member companies.

### 4. Second Discovery Order

In a July 9, 2015 order ("Second Discovery Order"), the district court stated that defendants had properly objected to discovery requests unrelated to the threshold jurisdictional issue and appropriately responded to requests for documents on which they would rely. Nevertheless, because defendants had failed to provide discovery "regarding [BNTK's] ownership and structure," to which plaintiffs were entitled, the district court ordered that defendants make such production by July 31, 2015, as well as identify a witness for deposition pursuant to Fed. R. Civ. P. 30(b)(6). *Id.* **at 323.**

### 5. Further Discovery Disputes

On July 29, 2015, defendants supplemented their interrogatory responses to state that "[n]one of the constituent entities of [BNTK] is a subsidiary of [it]"; that BNTK's "constituent entities are independent legal entities over which [it] exercises certain state–related *management and administrative responsibilities and functions*"; and that those constituent entities "may be owned, in whole or in part, by the Republic of Belarus, or ... by others, including private entities." *Id.* at 327. The next day, however, defendants appealed the Second Discovery Order to this court.

On July 31, **the deadline set in the Second Discovery** Order, plaintiffs moved for sanctions based on defendants' failure to provide documents showing BNTK's structure or ownership. In response to the district court's ensuing order to show cause why "substantial sanctions ... should not be issued," including "monetary

sanctions, deeming issues admitted, or precluding defendants from proving issues on which they are alleged to have blocked discovery," Order, *Funk v. Belneftekhim*, No. 14–cv–376 (BMC) (E.D.N.Y. July 31, 2015), defendants argued that their appeal divested the district court of jurisdiction and, in any event, they had satisfied their *prima facie* burden as to the defense of foreign sovereign immunity.

### 6. First Sanctions Order

The district court was not persuaded and, in an order dated August 13, 2015 ("First Sanctions Order"), ruled that it was not divested of jurisdiction because its Second Discovery Order was not final and, therefore, defendants' appeal from that order was frivolous. As to sanctions, the district court observed that there could be "no dispute" that defendants had failed to produce ordered discovery and that the failure was "willful." J.A. 342. It concluded that defendants could not use sovereign immunity "manipulatively" to avoid providing plaintiffs with a fair opportunity to define issues of fact and law relevant to that immunity claim and the court with the full record needed to decide the issue. *Id.* Accordingly, it imposed a monetary sanction of $2,000 per day, payable to the Clerk of Court, which would run until defendants complied with the Second Discovery Order. It also imposed a one-time **$5,000 sanction payable to plaintiffs for having to litigate the discovery dispute. Finally, the district court warned** that, absent compliance, it would consider additional sanctions, **\*362** including orders of preclusion, denial of the pending motion to dismiss, and entry of a default judgment.

The following day, defendants appealed the First Sanctions Order. Denied a stay pending that appeal, defendants continued to defy the district court's Second Discovery Order, prompting plaintiffs to seek default judgment as a sanction.

On October 6, 2015, a motions panel of this court granted plaintiffs' motion to dismiss defendants' appeals from both the Second Discovery Order and the First Sanctions Order on the ground anticipated by the district court, *i.e.*, **that neither order satisfied the finality requirement of** 28 U.S.C. § 1291.

### 7. Second Sanctions Order

On October 20, 2015, the district court granted plaintiffs' motion for further sanctions, but denied the requested default judgment, stating that it was "important to impose sanctions in a graduated manner and [to] avoid the most severe sanction unless nothing else will suffice." J.A. 360. Observing that "[m]onetary sanctions have not succeeded in inducing compliance" with its discovery orders, the district court decided to "strike[ ] the sovereign immunity defense," in order to "restore the prejudiced party," *i.e.*, plaintiffs, "to the same position [they] would have been in absent the wrongful withholding of evidence" by defendants. *Id.* at 351, 359 (alterations and internal quotation marks omitted). The district court halted its earlier *per diem* monetary sanction, but ordered defendants to pay within two weeks the $136,000 in accumulated sanctions to the Clerk of Court, as well as the $5,000 litigation-expense sanction to plaintiffs.

When defendants appealed this Second Sanctions Order, plaintiffs again moved to dismiss, but that relief was denied without prejudice by a motions panel of this court. Meanwhile, plaintiffs filed an amended complaint in the district court and again moved for default judgment in light of defendants' continued noncompliance with discovery. Defendants moved to dismiss the amended complaint, but no decision was rendered because, after this court's denial of plaintiffs' motion to dismiss this appeal, the district court stayed further proceedings in this case.

## II. Discussion

### A. Appellate Jurisdiction

[1] [2]Plaintiffs challenge our jurisdiction to review the Second Sanctions Order on the ground that it is interlocutory rather than final as required by 28 U.S.C. § 1291. In urging otherwise, defendants invoke the collateral order doctrine, which allows interlocutory appeals from the small class of orders that "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (allowing interlocutory appeals from "small class" of orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated"); *accord United States v. Prevezon Holdings Ltd.*, 839 F.3d 227,

235 (2d Cir. 2016). The challenged Second Sanctions Order satisfies these requirements.

First, by striking defendants' foreign sovereign immunity claim, the district court removed the claim from the case, **\*363** which effectively determined the immunity issue against defendants as conclusively as if the court had ruled adversely on the motion to dismiss that raised it. This court has "consistently held that [a] threshold sovereign-immunity determination is immediately reviewable under the collateral-order doctrine." *EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 87–88 & n.36 (2d Cir. 2015).

Second, whether a foreign sovereign immunity claim is struck or rejected, a defendant's professed entitlement to such immunity is an issue distinct from the merits of a plaintiff's underlying claims. Further, the importance of such immunity is the same in either circumstance, as it informs the district court's subject–matter jurisdiction. *See* 28 U.S.C. § 1330(a).

Third, whether a foreign sovereign immunity claim is struck from the case as a sanction or rejected as a ground for dismissal, the denial of immunity is effectively unreviewable after final judgment because defendants must litigate the case to reach judgment and, thus, lose the very immunity from suit to which they claim to be entitled. *See generally Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, — U.S. ——, 137 S.Ct. 1312, 1317, 197 L.Ed.2d 663 (2017) (observing "basic objective" of foreign sovereign immunity is "to free a foreign sovereign from *suit*" so that it should be decided "as near to the outset of the case as is reasonably possible" (emphasis in original)); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) (recognizing sovereign immunity as "immunity from trial and the attendant burdens of litigation" (internal quotation marks omitted)).

Plaintiffs nevertheless maintain that Supreme Court precedent precludes application of the collateral order doctrine to Rule 37 discovery sanctions. *See Cunningham v. Hamilton County*, 527 U.S. 198, 200, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999) (holding that monetary sanction imposed pursuant to then–Fed. R. Civ. P. 37(a)(4) is not appealable collateral order); *accord Linde v. Arab Bank, PLC*, 706 F.3d 92, 104–06 (2d Cir. 2013) (holding discovery sanction pursuant to Fed. R. Civ. P. 37(b) allowing jury to draw inference of misconduct is not appealable collateral order); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009) (observing that, in determining whether interlocutory order can be appealed, court's focus

should be on "entire category to which a claim belongs" rather than on "individualized jurisdictional inquiry" (internal quotation marks omitted)).

The rule certainly applies to most discovery sanctions because, as *Cunningham* recognized, such sanctions are generally "inextricably intertwined with the merits of the action"; indeed, a determination as to the propriety of such sanctions will usually require an assessment of "the importance of the information sought or the adequacy or truthfulness of a response." *Cunningham v. Hamilton County*, 527 U.S. at 205, 119 S.Ct. 1915; *accord SEC v. Smith*, 710 F.3d 87, 94 (2d Cir. 2013) (stating, in holding monetary sanction under Fed. R. Civ. P. 11 not to be appealable collateral order, that *Cunningham* "relied heavily on the fact that review of sanctions orders could not remain entirely separate from the merits of the underlying litigation"). In *Smith*, however, this court referenced, without addressing, the possibility that "some types of sanctions may be immediately appealable if the rationale underlying the *Cunningham* decision does not apply." 710 F.3d at 95 n.8.

That is the case with respect to the discovery sanction here, which strikes the foreign sovereign immunity claim that was the singular object of discovery. Neither *364 the ordered discovery nor the ensuing sanction was in any way informed by the merits of the underlying tort action. Indeed, the district court found that defendants acted properly in refusing, at this stage of the proceedings, to respond to discovery demands relating to anything other than the distinct issue of "whether [BNTK] qualifies as an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b)." J.A. 322 (internal quotation marks omitted).

[3]Precedent has recognized that striking a sovereign immunity claim can be immediately appealable as a final order, at least where, as here, a party "asserts not merely immunity from judgment, but immunity from the burden of having to defend the claim" at all. *Ehre v. New York* (In re *Adirondack Ry. Corp.*), 726 F.2d 60, 62 (2d Cir. 1984) (holding that decision to strike sovereign immunity was not final order where state claimed immunity "to insulate it at most from a money judgment and not from the burden of litigating the trustee's claim" for declaratory judgment). In such circumstances, "appeal from final judgment cannot repair the damage that is caused by requiring the defendant to litigate." *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d at 756. Indeed, striking a claim of foreign sovereign immunity is the functional equivalent of denying such an assertion on its merits, and *Rein* held that the latter decision constitutes an appealable collateral order. *See id.; cf. also Microsoft*

*Corp. v. Baker*, —— U.S. ——, 137 S.Ct. 1702, 1711 n.7, —— L.Ed.2d —— (2017) (stating that "order striking class allegations is 'functionally equivalent' " to appealable order denying class certification and thus is also appealable (alteration omitted)).

As for *Cunningham*'s concern with piecemeal litigation, *see* 527 U.S. at 209, 119 S.Ct. 1915, that is necessarily outweighed here by Congress's decision to afford foreign states immunity from the jurisdiction—not simply the judgments—of United States courts subject to certain statutory exceptions not at issue on this appeal. *See* 28 U.S.C. §§ 1330, 1604–1607. That conclusion is only reinforced by the narrowness of our decision today, which pertains only to a sanction that actually strikes a foreign sovereign immunity claim, not to lesser or distinct sanctions—*e.g.*, monetary or instructional—that may make it harder for a party that has failed to provide ordered jurisdictional discovery to support its immunity claim.

[4]Plaintiffs further argue that the collateral order doctrine affords appellate jurisdiction to review adverse foreign sovereign immunity determinations only where sovereignty is undisputed or favorably adjudicated, that is, where an acknowledged sovereign is denied immunity under one of the statutory exceptions. The argument, unsupported by any authority, does not persuade us because this court has exercised appellate jurisdiction over interlocutory denials of sovereign immunity based solely on a finding that a party is not an agency or instrumentality of a foreign state under the FSIA. *See Filler v. Hanvit Bank*, 378 F.3d 213, 216–17 (2d Cir. 2004). Thus, we conclude that the collateral order doctrine can apply when foreign sovereign immunity is conclusively denied to a party who invokes it to avoid the burden of litigation; it is not limited to foreign states denied immunity under an FSIA exception.

Finally, plaintiffs argue that only adverse immunity decisions turning exclusively on issues of law are immediately appealable. *See, e.g., Grune v. Rodriguez*, 176 F.3d 27, 32 (2d Cir. 1999) (holding that where appeal from denial of summary judgment based on qualified immunity does not turn on purely legal issue, but *365 instead challenges district court's determination that dispute of material fact existed, appellate jurisdiction will not lie); *United States v. Yonkers Bd. of Educ.*, 893 F.2d 498, 502 (2d Cir. 1990) (collecting cases adopting proposition that "[d]enials of motions to dismiss on grounds of immunity ... are not appealable ... unless the immunity defense can be decided solely as a matter of law"). The point merits little discussion because the issue presented on this appeal is one of law, specifically,

Funk v. Belneftekhim, 861 F.3d 354 (2017)

whether the district court, as a matter of law, exceeded its discretion in striking defendants' foreign sovereign immunity claim as a discovery sanction. That issue is distinct from and does not require us to decide whether defendants are actually entitled to immunity, a question that can present disputes of fact.

Accordingly, because (1) striking defendants' foreign sovereign immunity claim effectively denied defendants such immunity, (2) that immunity issue is distinct from the merits of plaintiffs' underlying tort claims and important to the case insofar as it informs the district court's jurisdiction, and (3) the issue is effectively unreviewable on appeal to the extent defendants will be forced to engage in the very litigation that immunity allows a foreign sovereign to avoid, we here conclude that we have jurisdiction under the collateral order doctrine to review the Second Sanctions Order challenged on this appeal.

### B. Second Sanctions Order

[5] Rule 37 of the Federal Rules of Civil Procedure states that "[i]f a party ... fails to obey an order to provide or permit discovery, ... the court where the action is pending may issue further just orders," including, *inter alia*, "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims," and "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(i), (ii).' We accord deferential review to a district court's imposition of Rule 37 discovery sanctions, and we will reverse only for abuse of discretion, which we will not identify absent an error of law, a clearly erroneous finding of fact, or a decision that cannot be located within the range of permissible options available to the district court. *See* **\*366** *Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 143 (2d Cir. 2010); *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 147–48 (2d Cir. 2016).

[6] In imposing Rule 37 sanctions, as well as in reviewing a sanctions order for abuse of discretion, courts properly consider various factors, including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance[;] and (4) whether the non–compliant party had been warned of the consequences of noncompliance." *Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d at 144 (internal quotation marks omitted); *see also id.* (observing that factors are "not exclusive"). In maintaining that the

Second Sanctions Order manifests abuse of discretion, defendants argue generally that no jurisdictional discovery and, therefore, no sanctions were warranted because their submission of Belarusian law established their entitlement to foreign sovereign immunity as a matter of law. In any event, they argue that the sanction of striking their immunity claim exceeded the district court's discretion. We address each argument in turn.

#### 1. The District Court Acted Within Its Discretion in Ordering Jurisdictional Discovery

[7] [8] The Constitution extends federal judicial power to all cases "between a State, or the Citizens thereof, and foreign states, Citizens or Subjects." U.S. Const. art. III, § 2, cl. 1. Congress, however, has conferred such original jurisdiction on district courts to hear civil actions against foreign states only to the extent "the foreign state is not entitled to immunity" under either the FSIA or an international agreement. 28 U.S.C. § 1330(a). Because sovereign immunity thus shields a foreign state from litigation, this court has cautioned that, "in the FSIA context, discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007) (internal quotation marks omitted); *see First City, Texas–Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998) (observing that comity concerns involved in ordering foreign sovereign to produce discovery require "delicate balancing"). A district court is "typically within its discretion" to order jurisdictional discovery where a plaintiff has "made out a prima facie case for jurisdiction." *Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*, 582 F.3d 393, 401 (2d Cir. 2009) (internal quotation marks omitted). At the same time, however, in the FSIA context, a defendant asserting sovereign immunity to defeat jurisdiction has the initial burden to "present[ ] a prima facie case that it is a foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993).

The FSIA defines a "foreign state" to "include[ ] a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality" of a foreign state (1) is a "separate legal person"; (2) which is an "organ" or "political subdivision" of a foreign state, or a majority of whose shares or ownership interest is held by a foreign state or political subdivision thereof; and (3) is neither a citizen of a state of the United States nor created under the laws of a third country. *Id.* § 1603(b).

To carry its *prima facie* burden, defendants initially relied only on plaintiffs' original complaint, which alleged defendants to be owned by and controlled by the **\*367 government of Belarus.**[4] Subsequently, they proffered the **Gvozdev Declaration and its attachments** purportedly showing, among other things, that (1) BNTK's assets are the **property of Belarus,** (2) BNTK's **chairman is appointed by the Belarusian government and the number of its employees and their salaries are set by that government,** (3) BNTK manages the Belarusian petrochemical industry and **exclusively licenses trade in and sets prices for that country's petroleum products, and** (4) BNTK provides regular reports of its activities to Belarusian government agencies. Further, defendants pointed to a United States Congressional Research Service report referring to BNTK as a state-owned entity. Defendants argue that these submissions did more than satisfy their *prima facie* burden; they established their entitlement to sovereign immunity as a matter of law.

In arguing otherwise, plaintiffs rely, as they did in the district court, on their complaint's assertion that they purchased an equity interest in BNTK from defendants, *see supra* at **[5]**; the Fishkin Affidavit's challenge to defendants' representations of Belarusian law and BNTK's status thereunder, *see supra* at **[10–11]**; and on a declaration from a reporter named Viktor Lushin, asserting that, in October 2006 interviews, BNTK executives told him that BNTK "was a commercial company owned by private investors and not by the government of Belarus," and that media "mischaracteriz[ations]" of BNTK as "government owned" had made it difficult "to solicit private investments," A.S.A. 71.[5]

[9]On this record, we identify no abuse of discretion in the district court's decision to order limited jurisdictional discovery as to BNTK's "ownership and structure." J.A. 323. While the Belarusian laws and related materials produced by defendants, viewed most favorably to them, *support the argument that BNTK is an organ of, or an entity majority owned by,* Belarus, plaintiffs provided adequate contrary evidence, both in the form of expert opinion and admissions attributed to defendants' own agents, to give rise to a colorable factual dispute on the "foreign state" issue. Further, the district court's discovery order was appropriately circumspect in limiting inquiry to the "specific facts" of ownership and structure that are "crucial to an immunity determination" in this case. *EM Ltd. v. Republic of Argentina*, 473 F.3d at 486 (internal quotation marks omitted); *see* J.A. 322–23 (stating that plaintiffs are "not entitled to discovery regarding *any* matter relevant to their claims" but only as

to "threshold issue" of "whether [BNTK] qualifies as an agency or instrumentality of a foreign state," nor are plaintiffs "yet entitled to discovery" as to whether "commercial **activity exception to sovereign immunity applies" (emphasis in original) (internal quotation marks omitted)).**

[10]Defendants' invocation of the act-of-state doctrine warrants no different conclusion. That doctrine precludes the courts of one state from "question[ing] the validity of public acts ... performed by other sovereigns within their **own borders."** *Republic of Austria v. Altmann*, 541 U.S. 677, 700, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). As applied here, that doctrine may bar plaintiffs from challenging the validity of the proffered laws. It does not, however, preclude plaintiffs from disputing the completeness of defendants' legal proffer or the accuracy of their translations and, on **\*368** that basis, questioning whether the submitted provisions of Belarusian law say what defendants maintain they say. Nor does the act-of-state doctrine preclude inquiry into the still-opaque operational and ownership structure of BNTK to determine whether it is reasonably viewed as having two components, at least one of which is a privately owned commercial entity.

With such material factual issues raised, but not answered, by the parties' conflicting submissions, defendants cannot persuasively maintain that they established sovereign immunity as a matter of law or that "[p]laintiffs' discovery requests do not relate to facts that would change the immunity determination." Appellants' Br. 31. Thus, their argument that the district court exceeded its discretion in ordering any jurisdictional discovery in this case fails on the merits.

### 2. The Sanctions Imposed

We now consider whether defendants' failure to obey the district court's Second Discovery Order warranted sanctions, including the particular sanction of striking defendants' foreign sovereign immunity defense to subject-matter jurisdiction.

The district court issued the First Sanctions Order on *August 13, 2015, after defendants failed to meet the July 31, 2015 deadline for document discovery set in the* **Second Discovery Order. The First Sanctions Order required defendants to pay $2,000 to the Clerk of Court** for every day they failed to provide the ordered discovery, as well as $5,000 in litigation costs to plaintiffs. When defendants persisted in resisting the Second Discovery

Order as well as the monetary sanction for an additional two months, the district court concluded that the monetary sanction was ineffective and, on October 20, 2015, issued a Second Sanctions Order halting accrual of the monetary sanction (though requiring defendants to pay the amounts owing to date) and, instead, striking defendants' foreign sovereign immunity defense.

We identify no abuse of discretion in the district court's conclusion that Rule 37 sanctions, in general, were warranted in this case. In imposing both its First and Second Sanctions Orders, the district court specifically found that defendants' failure to comply with the Second Discovery Order was "willful." J.A. 342 (First Sanctions Order); *id.* at 359–60 (Second Sanctions Order). Defendants do not challenge that factual finding, which is amply supported by the record. Thus, the first factor identified in *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d at 144, weighs strongly in favor of sanctions.

[11]A second factor, the duration of defendants' noncompliance, is more equivocal as the duration was not inordinately long: slightly over a month in the case of the First Sanctions Order and an additional two months in the case of the Second Sanctions Order. *Cf. id.* at 128 (upholding default and contempt sanctions where discovery battle had lasted more than two years). This does not, however, mean that the factor necessarily weighs against sanctions. We have never held that a district court, confronted with willful defiance of its discovery orders, must wait any particular time before imposing a sanction. Rather, the length of defiance can inform the propriety of a particular sanction. *See, e.g., Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 303 (2d Cir. 2009) (upholding dismissal sanction where failure to produce ordered discovery persisted for six months). Where, as here, the district court found that defendants willfully failed to comply with a second discovery order for a month, it did not exceed its discretion in then imposing a coercive monetary sanction in an effort to induce compliance. Defendants *369 themselves could have halted the sanction on any day by complying with the court's order.

Instead, defendants continued willfully to violate both the Second Discovery Order and the First Sanctions Order for another two months. In these circumstances, a total of three months of defiance was sufficient to allow the district court to conclude that defendants "never intended to comply with ... any of the Court's discovery orders," J.A. 359; that a monetary sanction would not induce compliance; and that a different sanction, one aimed at "put[ting] plaintiffs in the same position they might have

been in had defendants complied" with the Second Discovery Order, was warranted, *id.* at 360; *see Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1360–67 (2d Cir. 1991) (upholding sanction deeming facts established and precluding introduction of defense evidence where defendant's conduct over roughly two weeks made clear that it would not comply with court's production order).

[12]A third factor relevant to a sanctions decision is warning. *See Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d at 144. As this court has recognized, "[d]ue process requires that courts provide notice and an opportunity to be heard before imposing *any* kind of sanctions." *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 270 (2d Cir. 1999) (emphasis in original) (internal quotation marks omitted). In general, such notice should alert the party to the "particular sanction" under consideration. *SEC v. Razmilovic*, 738 F.3d 14, 24 (2d Cir. 2013) ("No sanction should be imposed without giving the disobedient party notice of the particular sanction sought and an opportunity to be heard in opposition to its imposition."). Nevertheless, we have excused the lack of sanction–specific notice in certain circumstances. *See, e.g., Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 452–53 (2d Cir. 2013) (upholding Rule 37(b) default-judgment sanction against defendant who had received six sanction warnings as well as copy of plaintiff's order to show cause for default judgment, although no sanctions warning specifically referenced default judgment).

In here affording defendants notice and an opportunity to be heard on plaintiffs' initial July 31, 2015 motion for sanctions, the district court warned of three possible actions: "monetary sanctions, deeming issues admitted, or precluding defendants from proving issues on which they are alleged to have blocked discovery." Order, *Funk v. Belneftekhim*, No. 14–cv–376 (BMC) (E.D.N.Y. July 31, 2015). In its First Sanctions Order, imposing monetary sanctions, the district court warned that "in the event defendants continue their non-compliance" with discovery, still further sanctions were possible, "including" not only the previously mentioned "orders of preclusion," but also "denial of the [defendants'] pending motion [to dismiss], or a default judgment" in favor of plaintiffs. J.A. 343.

Neither of these orders specifically referenced *striking* defendants' foreign sovereign immunity defense to jurisdiction. But to the extent (1) defendants had blocked discovery on the single issue of their status as a foreign state entitled to sovereign immunity and (2) their pending motion to dismiss was based in part on the purported lack

of subject-matter jurisdiction based on foreign sovereign immunity, there was little practical difference—for purposes of notice—between, on the one hand, warning defendants that (a) they could be precluded from offering proof of their claimed foreign–state status or (b) a motion dependent on that status could be denied, and, on the other hand, warning them that the foreign sovereign immunity basis for their **\*370** motion could be struck. Thus, the warning factor here satisfactorily supports the **district court's decision to impose further sanctions.**

That leaves us with a single question: Did the district court exceed its discretion in imposing the *particular* sanctions identified in its Second Sanctions Order? That question is akin, although not identical, to a fourth-factor inquiry as to the efficacy of lesser sanctions. *See Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d at 144.

[13]To the extent the Second Sanctions Order required defendants to pay the monetary sanctions that had accumulated under the First Sanctions Order as well as a litigation–expense sanction imposed by that order, we conclude that the district court acted well within its discretion. As neither of these sanctions had induced **plaintiffs' compliance with ordered discovery, there is no reason to think any lesser sanction would have been more effective.** More to the point, defendants were not entitled to be absolved of monetary sanctions willfully incurred under the First Sanctions Order during the two months they persisted in defying the Second Discovery Order. Accordingly, we affirm that part of the Second Sanctions Order requiring defendants to pay their monetary obligations under the First Sanctions Order.

[14]We cannot reach the same conclusion with respect to that part of the Second Sanctions Order **striking defendants' foreign sovereign immunity defense to jurisdiction.** In *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155 (2d Cir. 2012), this court held that a sanction striking a claim for damages based on a plaintiff's late filing of expert disclosures, despite numerous extensions, **constituted an abuse of discretion requiring vacatur,** *see id.* at 156–57. We explained that "striking [plaintiff's] request for damages reflects a harsh sanction, one akin to dismissing the action altogether," so that "we apply the same standards as we would have if the district court dismissed the case **instead."** *Id.* at 159. **That standard permits such a harsh** sanction "only in extreme circumstances" and "after consideration of alternative, less drastic sanctions." *Id.* (internal quotation marks omitted).

The sanction imposed on defendants here is not exactly

akin to the dismissal of a plaintiff's complaint. Still, **the** harshness of the sanction is comparable in that it effectively denied defendants a jurisdictional defense that could have allowed them to avoid litigating plaintiffs' case in its entirety. Indeed, the sanction here is more troubling insofar as striking a jurisdictional challenge, rather than rejecting it on the merits, risks a district court's exercise of jurisdiction where none may exist. Such a sanction exceeds a district court's discretion to issue "just orders." Fed. R. Civ. P. 37(b)(2)(A).

[15]As this court has recognized, "sovereign immunity (or, more precisely, the absence of sovereign immunity) is an element of subject matter jurisdiction under the FSIA." *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d at 763; *see also id.* (reiterating that foreign sovereign immunity is "matter of direct jurisdictional moment" and not simply "affirmative defense to suits under the FSIA"). *Rein* reached this conclusion without regard to the fact that the sovereign immunity jurisdictional limitation derives from statute rather than the Constitution. *See generally Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 313 (2d Cir. 1981) (locating "constitutional basis for the statutory exercise of subject matter jurisdiction" under FSIA in suit brought by U.S. plaintiff in **\*371** U.S. Const. art. III, § 2, cl. 1, which grants federal courts diversity jurisdiction over suits between state, or citizens thereof, and foreign states).

[16]Federal courts are not empowered to confer subject-matter jurisdiction on themselves. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) ("The district courts of the United States, as we have said many times, are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." (internal quotation marks omitted)); *see generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (observing with reference to both statutory and constitutional elements of jurisdiction that for court to render decision in absence of jurisdiction "is, by very definition, for a court to act ultra vires"); *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000) ("It is axiomatic that federal courts are courts of limited jurisdiction and may not decide cases over which they lack subject matter jurisdiction."). Thus, in *Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121 (2d Cir. 1999), this court held that, in the absence of subject-matter jurisdiction, a district court did not have the power to sanction a party's failure to comply with discovery and other procedural orders by dismissing its complaint with prejudice, *see id.* at 124.

*Hernandez* reached this conclusion against the

background of an express ruling that Article III rather than statutory subject-matter jurisdiction were there lacking. *See id.* at 123; *Hernandez v. Conriv Realty Assocs.*, 116 F.3d 35, 38–40 (2d Cir. 1997) **(identifying lack of both diversity and federal question jurisdiction in earlier appeal in same case)**. Here, the disputed question of subject-matter jurisdiction arises under the FSIA, and the district court issued no merits ruling. Rather, by striking defendants' foreign sovereign immunity claim as a discovery sanction, the court mooted that jurisdictional challenge. **Insofar as defendants were thus denied FSIA immunity, based not on a merits finding that they failed to come within its scope, but as a discovery sanction, a concern arises that the district court may have conferred subject-matter jurisdiction on itself where it may have been lacking.** *See Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d at 763 **(observing that "power to abrogate (or confer) sovereign immunity is, under the FSIA, therefore the power to confer (or abrogate) jurisdiction"). This exceeds a district court's sanctioning** discretion, particularly where alternatives are available.[6]

Among those alternatives are (1) according an evidentiary presumption against defendants that withheld discovery would **refute** their claim that BNTK **is an organ or instrumentality of Belarus, and (2) prohibiting defendants from offering further supporting evidence on that issue.** *See* **\*372** Fed. R. Civ. P. 37(b)(2)(A)(i), (ii). Such sanctions would have served the district court's proper objective to restore plaintiffs **"insofar as possible" to the position they would have been in absent defendants'** discovery defiance. J.A. 359 (internal quotation marks omitted). **For example, defendants' failure to provide discovery as to BNTK's structure and ownership could** support a presumption that the withheld evidence would have confirmed the Fishkin Affidavit's representation that BNTK has two components, one of which operates as a privately owned commercial enterprise. *That failure would further support precluding defendants from* **offering structure and ownership evidence to the contrary.**[7]

On such a record, defendants' foreign sovereign immunity claim might well fail. Thus, the practical difference *between an evidentiary sanction and one striking* defendants' foreign sovereign immunity claim may appear small. Not so, however, their jurisdictional effect. Evidentiary sanctions could shape, even limit, the factual record. But the district court would still have to make a merits ruling from that record on defendants' foreign sovereign immunity claim. In short, it would have to decide its jurisdiction, not assume it. Courts routinely decide issues based on limited records when parties—for whatever reason—are unable to locate or produce all the

evidence relevant to a point in dispute. By contrast, a discovery sanction that strikes an FSIA claim without regard to its merits risks a court's assumption of jurisdiction that might be lacking.

[17] [18]*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), **requires no different conclusion.** There, the Supreme Court upheld a discovery sanction that deemed established jurisdictional facts relating to **personal jurisdiction.** *See id.* at 705–06, 102 S.Ct. 2099. The Court observed that the personal jurisdiction requirement affords an individual right, which can be waived. *See id.* at 702–04, 102 S.Ct. 2099. **At the same time, the Court cautioned that a similar conclusion might not apply to facts establishing subject-matter jurisdiction.** *See id.* at 701–02, 102 S.Ct. 2099. **The Court's focus,** however, was on Article III, which "functions as a restriction on federal power, and contributes to the **characterization of the federal sovereign."** *Id.* at 702, 102 S.Ct. 2099. **As earlier noted, there is no question that** Article III jurisdiction extends to actions against foreign states. *See* U.S. Const. art. III, § 2, cl. 1; *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Such foreign sovereign immunity limitations as are imposed on the exercise of such jurisdiction are created by statute and, by statute, can be waived **"either explicitly or by implication."** 28 U.S.C. § 1605(a)(1). **Thus, we do not understand** *Insurance Corp. of Ireland* **to limit a district court's discretion in imposing** *evidentiary* **sanctions on defendants here for failing to produce ordered discovery relevant to their FSIA challenge to jurisdiction.**[8]

**\*373** In sum, because the sanction striking defendants' FSIA claim raises concerns about judicial assumption of jurisdiction, which can be avoided with lesser efficacious *sanctions shaping the evidentiary record, we conclude that* imposition of the striking sanction here exceeded the **district court's Rule 37(b) discretion. We therefore vacate the Second Sanctions Order only insofar as it strikes** defendants' foreign sovereign immunity challenge to jurisdiction.

### C. Remand Challenge

Defendants argue that the identification of sanction error in this case does not warrant remand because this court can decide that, as a matter of law, defendants established their foreign sovereign immunity claim. We decline this invitation because, like the district court, we think that the record on appeal reveals material factual disputes as to both the organ and ownership prongs of the foreign state **definition in** 28 U.S.C. § 1603(b)(2). **Moreover, on**

Funk v. Belneftekhim, 861 F.3d 354 (2017)

remand, these issues may be recast if the district court imposes evidentiary sanctions for defendants' discovery violations, or obviated by discovery and findings as to whether defendants fall within any of the FSIA's statutory exceptions to sovereign immunity. *See generally Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (holding that, in assessing FSIA jurisdiction, district court should "review the allegations in the complaint, the undisputed facts, if any, placed before it by the parties, and—if the plaintiff comes forward with *sufficient evidence* to carry *its* burden of production on this issue—resolve disputed issues of fact, with the defendant foreign sovereign shouldering the burden of persuasion"). The district court can decide in the first instance whether to consider additional documents submitted by BNTK after the filing of this appeal.

**Accordingly, we remand the case for further proceedings consistent with this opinion.**

**III. *Conclusion***
To summarize, we conclude as follows:

1. Pursuant to the collateral order doctrine, we have appellate jurisdiction to review the Second Sanctions Order striking defendants' foreign sovereign immunity claim because it conclusively determines an important question separate from the merits, which is effectively **unreviewable on appeal from final judgment.** *See Coopers & Lybrand v. Livesay*, 437 U.S. at 468, 98 S.Ct. 2454.

2. Because the parties' submissions present disputes of material fact as to BNTK's foreign sovereign immunity claim, the district court acted within its discretion in ordering jurisdictional discovery.

3. Having reasonably found defendants to have willfully failed to produce ordered discovery and having adequately warned defendants of the serious sanctions that could result from their persisting in that failure, the **district court acted within its discretion under** Fed. R. Civ. P. 37(b) in ordering daily monetary sanctions and litigation costs in an initial effort to induce discovery compliance and, when that failed, in requiring defendants to pay the accumulated monetary sanctions in its Second Sanctions Order.

4. Defendants' continued discovery violations despite monetary sanctions supported **\*374** the district court's conclusion that more severe sanctions were warranted. The chosen sanction striking defendants' FSIA challenge to jurisdiction, without regard to its merits, however, **exceeded the court's** Rule 37(b) **discretion because it** raised concerns about the court's assumption of jurisdiction that may, in fact, have been lacking. Those concerns could have been avoided by lesser efficacious sanctions shaping the evidentiary record in advance of a *merits decision on the foreign sovereign immunity claim.*

Accordingly, the Second Sanctions Order is AFFIRMED in part and VACATED in part, and the case is REMANDED for further proceedings consistent with this opinion.

**All Citations**

861 F.3d 354

Footnotes

1    *See* Exec. Order No. 13,405, 71 Fed. Reg. 35,485 (June 16, 2006) (determining that sanctions were appropriate because "actions and policies of certain members of the Government of Belarus and other persons to undermine Belarus' democratic processes or institutions, manifested most recently in the fundamentally undemocratic March 2006 elections, to commit human rights abuses related to political repression, including detentions and disappearances, and to engage in public corruption, including by diverting or misusing Belarusian public assets or by misusing public authority, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States").

2    The district court also identified the need for further factual development on the issue of whether defendants had been properly served. Because defendants subsequently waived that defense, we need not discuss it further here.

3    In its entirety, Rule 37(b)(2)(A) reads as follows:
       If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
           (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes

Funk v. Belneftekhim, 861 F.3d 354 (2017)

> of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or
>
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(C) adds that "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

4    Plaintiffs' amended complaint did not repeat this allegation.

5    "A.S.A." refers to the "Appellees' Supplemental Appendix."

6    In this case, we do not deal with an exercise of "hypothetical jurisdiction," where distinctions between statutory and constitutional jurisdiction have been recognized. See In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 497 (2d Cir. 2002) (holding that bar on exercise of "hypothetical jurisdiction" applies where possible lack of jurisdiction poses "constitutional question" (internal quotation marks omitted)). Even in the statutory context, we have assumed hypothetical jurisdiction only to dismiss a clearly meritless claim, not to allow it to go forward as the challenged striking sanction would here. See, e.g., Guaylupo–Moya v. Gonzales, 423 F.3d 121, 132 n.10 (2d Cir. 2005); Center for Reprod. Law & Policy v. Bush, 304 F.3d 183, 195 (2d Cir. 2002); see also Ortiz–Franco v. Holder, 782 F.3d 81, 86 (2d Cir. 2015) (stating that hypothetical jurisdiction is "prohibited in all but the narrowest circumstances").

7    These examples are intended to be illustrative, not exhaustive, of the available evidentiary sanctions.

8    In light of the availability of these evidentiary sanctions, we do not here decide whether a case could ever arise in which persistent discovery violations could be found to manifest a waiver of foreign sovereign immunity sufficient to support a court's striking the FSIA challenge to jurisdiction even over the asserting party's objection. See generally Cabiri v. Gov't of Malaysia, 165 F.3d 193, 201 (2d Cir. 1999) (observing that waiver of foreign sovereign immunity will usually be implied only where state's intent to waive is unambiguous).

Insofar as plaintiffs urged us at oral argument to interpret the district court's striking of defendants' FSIA claim as the equivalent of it accepting plaintiffs' opposing facts as established and, therefore, of it resolving the immunity claim against defendants on the merits, we are not convinced the Second Sanctions Order reasonably admits such a reading. If that was the district court's intent, however, it can certainly clarify the point on remand. Alternatively, it can consider anew the possibility of evidentiary sanctions and an FSIA ruling based on a record shaped by such sanctions.

---

End of Document                                  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

137 S.Ct. 1178
**Supreme Court of the United States**

**GOODYEAR TIRE & RUBBER COMPANY,**
Petitioner
v.
**Leroy HAEGER, et al.**

No. 15–1406.
|
Argued Jan. 10, 2017.
|
Decided April 18, 2017.

**Synopsis**
**Background:** Consumers brought products liability
action against tire manufacturer, alleging that its defective
tires caused their motorhome to flip over on highway.
After parties entered into settlement, the United States
District Court for the District of Arizona, Roslyn O.
Silver, **Senior District Judge**, 906 F.Supp.2d 938, imposed
sanctions against manufacturer and its counsel.
Manufacturer and its counsel appealed. The Ninth Circuit
Court of Appeals, Milan D. Smith, Jr., **Circuit Judge**, 813
F.3d 1233, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Kagan, held that:

[1] an order issued under a federal court's inherent
authority to sanction a litigant for bad-faith conduct is
limited to the attorney fees the innocent party incurred
solely because of the misconduct;

[2] record did not allow finding that disclosure of heat-test
results would have led straightaway to settlement; and

[3] manufacturer's failure to disclose heat-test results did
not so permeate suit as to make that misconduct a but-for
cause of every subsequent legal expense.

Reversed and remanded.

Justice Gorsuch took no part in the consideration or
decision of this case.

**West Headnotes (26)**

[1]     **Federal Civil Procedure**
        ⚬—Computation; items and services
        compensable

        An order issued under a federal court's inherent
        authority to sanction a litigant for bad-faith
        conduct by ordering it to pay the other side's
        legal fees is limited to the fees the innocent
        party incurred solely because of the misconduct,
        or put another way, to the fees that party would
        not have incurred but for the bad faith, and
        district court has broad discretion to calculate
        fee awards under that standard.

        7 Cases that cite this headnote

[2]     **Federal Courts**
        ⚬—Inherent powers

        Federal courts possess certain inherent powers,
        not conferred by rule or statute, to manage their
        own affairs so as to achieve the orderly and
        expeditious disposition of cases.

        8 Cases that cite this headnote

[3]     **Federal Civil Procedure**
        ⚬—Type and Amount

        Federal courts' inherent authority to manage
        their own affairs includes the ability to fashion
        an appropriate sanction for conduct which
        abuses the judicial process.

        9 Cases that cite this headnote

[4]     **Federal Civil Procedure**
        ⚬—Computation; items and services
        compensable

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

One permissible sanction under a federal court's inherent power to manage its own affairs is an assessment of attorney fees, that is, an order instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side.

5 Cases that cite this headnote

[5]   **Federal Civil Procedure**
↦Monetary Sanctions

**A sanctions order under a federal court's** inherent power to manage its own affairs, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature.

5 Cases that cite this headnote

[6]   **Federal Civil Procedure**
↦Computation; items and services compensable

**An attorney fees award as sanctions under a** **federal court's inherent power to manage its** own affairs may go no further than to redress the wronged party for losses sustained; it may not impose an additional amount as punishment for **the sanctioned party's misbehavior.**

3 Cases that cite this headnote

[7]   **Federal Civil Procedure**
↦Computation; items and services compensable
**Federal Civil Procedure**
↦Proceedings
**Federal Civil Procedure**
↦Evidence

When a federal court, upon entering an attorney fees award under its inherent power to manage its own affairs, also levels a separate penalty as **punishment for the sanctioned party's**

misbehavior, it needs to provide procedural guarantees applicable in criminal cases, such as a "beyond a reasonable doubt" standard of proof, and when those criminal-type protections are missing, a court's shifting of fees is limited to reimbursing the victim.

1 Cases that cite this headnote

[8]   **Federal Civil Procedure**
↦Computation; items and services compensable

A federal court's sanction of a litigant for bad-faith conduct counts as compensatory, as required for the award to be made under the court's inherent authority, only if it is calibrated to the damages caused by the bad-faith acts on **which it is based, and a fee award is so** **calibrated if it covers the legal bills that the** litigation abuse occasioned, but if an award extends further than that, to fees that would have been incurred without the misconduct, then it **crosses the boundary from compensation to** **punishment.**

3 Cases that cite this headnote

[9]   **Federal Civil Procedure**
↦Computation; items and services compensable

A federal court, when using its inherent sanctioning authority and civil procedures to impose sanctions on a litigant for bad-faith conduct, must establish a causal link between **the litigant's misbehavior and legal fees paid by** **the opposing party.**

7 Cases that cite this headnote

[10]   **Federal Civil Procedure**
↦Inherent authority
**Federal Civil Procedure**

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

↩Reasonableness or bad faith in general;
objective or subjective standard

The undelegated inherent powers of a federal
court to sanction a litigant for bad-faith conduct
should be exercised with especial restraint and
**discretion.**

1 Cases that cite this headnote

[11]     **Federal Civil Procedure**
↩Computation; items and services
compensable

The causal connection required for the
imposition of sanctions on a litigant for
*bad-faith conduct by a federal court pursuant to*
its inherent powers is properly framed as a
but-for test: the complaining party may recover
only the portion of his fees that he would not
have paid but for the misconduct.

Cases that cite this headnote

[12]     **Federal Civil Procedure**
↩Failure to respond; sanctions

**When the cost would have been incurred in the
absence of the discovery violation, then, in
imposing sanctions on a litigant under its
inherent authority, a federal court, possessing
only the power to compensate for harm the
misconduct has caused, must leave it alone and
not award the cost.**

Cases that cite this headnote

[13]     **Federal Civil Procedure**
↩Computation; items and services
compensable

The but-for causation standard applicable to an
award of sanctions against a litigant for
*bad-faith conduct pursuant to a federal court's*

**inherent powers generally demands that a
district court assess and allocate specific
litigation expenses,** yet still allows it to exercise
discretion and judgment.

Cases that cite this headnote

[14]     **Federal Civil Procedure**
↩Computation; items and services
compensable

**A federal court's fundamental job in deciding
whether to award sanctions against a litigant for
bad-faith conduct is to determine whether a
given legal fee would or would not have been
incurred in the absence of the sanctioned
conduct;** *the award is then the sum total of the*
fees that, except for the misbehavior, would not
have accrued, but trial courts undertaking that
task need not, and indeed should not, become
green-eyeshade accountants.

1 Cases that cite this headnote

[15]     **Federal Civil Procedure**
↩Computation; items and services
compensable

The essential goal in a federal court shifting fees
as a sanction under its inherent authority is to do
rough justice, not to achieve auditing perfection.

2 Cases that cite this headnote

[16]     **Federal Civil Procedure**
↩Computation; items and services
compensable

**In deciding whether to award sanctions against a
litigant for bad-faith conduct under its inherent
powers, a district court may take into account its
overall sense of a suit, and may use estimates in
calculating and allocating an attorney's time.**

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

1 Cases that cite this headnote

[17]     **Federal Civil Procedure**
         Computation; items and services
         compensable
         **Federal Courts**
         Sanctions

In deciding whether to award sanctions against a
litigant for bad-faith conduct under its inherent
powers, a district court may decide that all or a
*set percentage of a particular category of
expenses were incurred solely because of a
litigant's bad-faith conduct, and such judgments,
in light of the trial court's superior
understanding of the litigation, are entitled to
substantial deference on appeal.*

Cases that cite this headnote

[18]     **Federal Civil Procedure**
         Computation; items and services
         compensable

In exceptional cases, the but-for standard for
deciding whether a district court may award
sanctions against a litigant for bad-faith conduct
*under its inherent powers permits a trial court to
shift all of a party's fees, from either the start or
some midpoint of a suit, in one fell swoop.*

Cases that cite this headnote

[19]     **Federal Civil Procedure**
         Computation; items and services
         compensable

If a plaintiff initiates a case in complete bad
faith, so that every cost of defense is attributable
only to sanctioned behavior, a district court, in
*awarding sanctions against a litigant for*
bad-faith conduct pursuant to its inherent
powers, may make a blanket award.

1 Cases that cite this headnote

[20]     **Federal Civil Procedure**
         Computation; items and services
         compensable

**If a district court, in awarding sanctions against
a litigant for bad-faith conduct pursuant to its
inherent powers, finds that a lawsuit, absent
litigation misconduct, would have settled at a
specific time, then the court may grant all fees
incurred from that moment on.**

Cases that cite this headnote

[21]     **Federal Civil Procedure**
         Computation; items and services
         compensable

District court applied wrong standard in
**awarding sanctions under its inherent powers
against tire manufacturer in products liability
action for bad-faith conduct, when it specifically
disclaimed the "usual" need to find a "causal
link" between misconduct and fees when the
sanctioned party's behavior "r[ose] to a truly
egregious level," and thought that in such
situation it could award "all" fees, including
those that would have been incurred in absence
of misconduct.**

Cases that cite this headnote

[22]     **Federal Courts**
         Determination and Disposition of Cause

**Court of appeals applied wrong standard in
affirming award by district court of sanctions
under its inherent powers against tire
manufacturer in products liability action for
bad-faith conduct, when court of appeals
imposed temporal limitation, not causal one, by
granting all attorney fees incurred "during the
time" when manufacturer was acting in bad**

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

faith.

Cases that cite this headnote

[23]     **Federal Civil Procedure**
↪Computation; items and services
compensable

**A federal court awarding sanctions against a
litigant for bad-faith conduct under its inherent
powers must determine which fees were
incurred because of, and solely because of, the
misconduct at issue, however serious, or
concurrent with a lawyer's work, it might have
been.**

7 Cases that cite this headnote

[24]     **Federal Civil Procedure**
↪Payment of expenses

Tire manufacturer's failure to disclose heat-test
results during discovery in products liability
action did not support $2.7 million award of
attorney fees to consumers as sanction under
district court's inherent powers, on ground that
disclosure of the results would have led
straightaway to settlement; test results did not
deprive manufacturer of colorable defenses, in
that manufacturer still could have argued that
tire, which had endured more than 40,000 miles
of wear and tear, failed because it struck road
debris, and, in another case, manufacturer
produced the very test results at issue here, yet
still elected to go to trial.

Cases that cite this headnote

[25]     **Federal Civil Procedure**
↪Payment of expenses

Tire manufacturer's failure to disclose heat-test
results did not so permeate consumers' products
liability lawsuit as to make that misconduct a

but-for cause of every subsequent legal expense,
as would be required to support district court's
award, under its inherent powers, of sanction of
**attorney fees totaling $2.7 million, and, at a
minimum, sanction order could not force
manufacturer to reimburse $700,000 of fees that
consumers incurred in litigating against other
defendants and proving their own medical
damages, since such fees had nothing to do with
manufacturer's discovery decisions.**

1 Cases that cite this headnote

[26]     **Federal Courts**
↪Particular cases

Upon determining that, at minimum, $700,000
of the $2.7 million award of attorney fees as
sanctions, under district court's inherent powers,
to consumers in products liability action against
tire manufacturer, was inappropriate, Supreme
Court, rather than remanding so that district
court could reconsider from scratch which fees
to shift, would remand for consideration whether
manufacturer waived any ability to challenge $2
million award by stating that only about
$700,000 of fees sought would have been
incurred regardless of manufacturer's behavior,
since court of appeals had not previously
addressed that issue, and Supreme Court would
decline to decide it in the first instance.

Cases that cite this headnote

***1181** Syllabus*
Respondents Leroy, Donna, Barry, and Suzanne Haeger
sued petitioner Goodyear Tire & Rubber Company,
alleging that the failure of a Goodyear G159 tire caused
the family's motorhome to swerve off the road and flip
over. After several years of contentious discovery,
marked by Goodyear's slow response to repeated requests
for internal G159 test results, the parties settled the case.
Some months later, the Haegers' lawyer learned that, in
another lawsuit involving the G159, Goodyear had
disclosed test results indicating ***1182** that the tire got
unusually hot at highway speeds. In subsequent
correspondence, Goodyear conceded withholding the

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

information from the Haegers, even though they had requested all testing data. The Haegers then sought sanctions for discovery fraud, urging that Goodyear's misconduct entitled them to attorney's fees and costs expended in the litigation.

The District Court found that Goodyear had engaged in an extended course of misconduct. Exercising its inherent power to sanction bad-faith behavior, the court awarded the Haegers $2.7 million—the entire sum they had spent in legal fees and costs since the moment, early in the litigation, when Goodyear made its first dishonest discovery response. The court said that in the usual case, sanctions ordered pursuant to a court's inherent power to sanction litigation misconduct must be limited to the amount of legal fees caused by that misconduct. But it determined that in cases of particularly egregious behavior, a court can award a party all of the attorney's fees incurred in a case, without any need to find a "causal link between [the expenses and] the sanctionable conduct." 906 F.Supp.2d 938, 975. As further support for its award, the District Court concluded that full and timely disclosure of the test results would likely have led Goodyear to settle the case much earlier. Acknowledging that the Ninth Circuit might require a link between the misconduct and the harm caused, however, the court also made a contingent award of $2 million. That smaller amount, designed to take effect if the Ninth Circuit reversed the larger award, deducted $700,000 in fees the Haegers incurred in developing claims against other defendants and proving their own medical damages. The Ninth Circuit affirmed the full $2.7 million award, concluding that the District Court had properly awarded the Haegers all the fees they incurred during the time when Goodyear was acting in bad faith.

*Held* : When a federal court exercises its inherent authority to sanction bad-faith conduct by ordering a litigant to pay the other side's legal fees, the award is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith. Pp. 1185 – 1190.

(a) Federal courts possess certain inherent powers, including "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27. One permissible sanction is an assessment of attorney's fees against a party that acts in bad faith. Such a sanction must be compensatory, rather than punitive, when imposed pursuant to civil procedures. See *Mine Workers v. Bagwell,* 512 U.S. 821, 826–830, 114 S.Ct. 2552, 129 L.Ed.2d 642. A sanction counts as

compensatory only if it is "calibrate[d] to [the] damages caused by" the bad-faith acts on which it is based. *Id.,* at 834, 114 S.Ct. 2552. Hence the need for a court to establish a causal link between the litigant's misbehavior and legal fees paid by the opposing party. That kind of causal connection is appropriately framed as a but-for test, meaning a court may award only those fees that the innocent party would not have incurred in the absence of litigation misconduct. That standard generally demands that a district court assess and allocate specific litigation expenses—yet still allows it to exercise discretion and judgment. *Fox v. Vice,* 563 U.S. 826, 836, 131 S.Ct. 2205, 180 L.Ed.2d 45. And in exceptional cases, that standard allows a court to avoid segregating individual expense items by shifting all of a party's fees, from either the start or some midpoint of a suit. Pp. 1185 – 1188.

*1183 (b) Here, the parties largely agree about the pertinent law but dispute what it means for this case. Goodyear contends that it requires throwing out the fee award and instructing the trial court to consider the matter anew. The Haegers maintain, to the contrary, that the award can stand because both courts below articulated and applied the appropriate but-for causation standard, or, even if they did not, the fee award in fact passes a but-for test.

The Haegers' defense of the lower courts' reasoning is a non-starter: Neither court used the correct legal standard. The District Court specifically disclaimed the need for a causal link on the ground that this was a "truly egregious" case. 906 F.Supp.2d, at 975. And the Ninth Circuit found that the trial court could grant all attorney's fees incurred "during the time when [Goodyear was] acting in bad faith," 813 F.3d 1233, 1249—a temporal, not causal, limitation. A sanctioning court must determine which fees were incurred because of, and solely because of, the misconduct at issue, and no such finding lies behind the $2.7 million award made and affirmed below. Nor is this Court inclined to fill in the gap, as the Haegers urge. As an initial matter, the Haegers have not shown that this litigation would have settled as soon as Goodyear divulged the heat-test results (a showing that would justify an all-fees award from the moment Goodyear was supposed to disclose). Further, they cannot demonstrate that Goodyear's non-disclosure so permeated the suit as to make that misconduct a but-for cause of every subsequent legal expense, totaling the full $2.7 million.

Although the District Court considered causation in arriving at its back-up award of $2 million, it is unclear whether its understanding of that requirement corresponds to the appropriate standard—an uncertainty pointing toward throwing out the fee award and instructing the trial

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

court to consider the matter anew. However, the Haegers contend that Goodyear has waived any ability to challenge the contingent award since the $2 million sum reflects Goodyear's own submission that only about $700,000 of the fees sought would have been incurred regardless of the company's behavior. The Court of *Appeals did not address that issue, and this Court declines* to decide it in the first instance. The possibility of waiver should therefore be the initial order of business on remand. Pp. 1188 – 1190.

813 F.3d 1233, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which all other Members joined, except GORSUCH, J., who took no part in the consideration or decision of the case.

**Attorneys and Law Firms**

Pierre H. Bergeron, for petitioner.

John J. Egbert, Phoenix, AZ, for respondents.

Pierre H. Bergeron, Gonzalo C. Martinez, Lauren S. Kuley, Colter L. Paulson, Squire Patton Boggs (US) LLP, Washington, DC, for petitioner.

John J. Egbert, Jennings, Strouss & Salmon, P.L.C., Phoenix, AZ, David L. Kurtz, The Kurtz Law Firm, Scottsdale, AZ, for respondents.

**Opinion**

Justice KAGAN delivered the opinion of the Court.

[1] In this case, we consider a federal court's inherent authority to sanction a *1184 litigant for bad-faith conduct by ordering it to pay the other side's legal fees. We hold that such an order is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith. A district court has broad discretion to calculate fee awards under that standard. But because the court here granted legal fees beyond those resulting from the litigation misconduct, its award cannot stand.

I

Respondents Leroy, Donna, Barry, and Suzanne Haeger sued the Goodyear Tire & Rubber Company (among other

defendants) after the family's motorhome swerved off the road and flipped over.[1] The Haegers alleged that the failure of a Goodyear G159 tire on the vehicle caused the accident: Their theory was that the tire was not designed to withstand the level of heat it generated when used on a motorhome at highway speeds. Discovery in the case lasted several years—and itself generated considerable heat. The Haegers repeatedly asked Goodyear to turn over internal test results for the G159, but the company's responses were both slow in coming and unrevealing in content. After making the District Court referee some of their more contentious discovery battles, the parties finally settled the case (for a still-undisclosed sum) on the eve of trial.

Some months later, the Haegers' lawyer learned from a newspaper article that, in another lawsuit involving the G159, Goodyear had disclosed a set of test results he had never seen. That data indicated that the G159 got unusually hot at speeds of between 55 and 65 miles per hour. In ensuing correspondence, Goodyear conceded withholding the information from the Haegers even though they had requested (both early and often) "all testing data" related to the G159. Record in No. 2:05–cv–2046 (D Ariz.), Doc. 938, p. 8; see *id.,* Doc. 938–1, at 24, 36; *id.,* Doc. 1044–2, at 25 (filed under seal). The Haegers accordingly sought sanctions for discovery fraud, claiming that "Goodyear knowingly concealed crucial 'internal heat test' records related to the [G159's] defective design." *Id.,* Doc. 938, at 1. That conduct, the Haegers urged, entitled them to attorney's fees and costs expended in the litigation. See *id.,* at 14.

The District Court agreed to make such an award in the exercise of its inherent power to sanction litigation misconduct.[2] The court's assessment of Goodyear's actions was harsh (and is not contested here). Goodyear, the court found, had engaged in a "years-long course" of bad-faith behavior. 906 F.Supp.2d 938, 972 (D.Ariz.2012). By withholding the G159's test results at every turn, the company and its lawyers had made "repeated and deliberate attempts to frustrate the resolution of this case on the merits." *Id.,* at 971. But because the case had already settled, the court had limited options. It could not take the measure it most wished: an "entry of default judgment" against Goodyear. *1185 Id.,* at 972. All it could do for the Haegers was to order Goodyear to reimburse them for attorney's fees and costs paid during the suit.

But that award, in the District Court's view, could be comprehensive, covering both expenses that could be causally tied to Goodyear's misconduct and those that could not. The court calculated that the Haegers had spent

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

$2.7 million in legal fees and costs since the moment, early in the litigation, when Goodyear made its first dishonest discovery response. And the court awarded the Haegers that entire sum. In the "usual[ ]" case, the court reasoned, "sanctions under a [c]ourt's inherent power must be limited to the amount [of legal fees] caused by the misconduct." *Id.,* at 974–975 **(emphasis deleted). But this case was not the usual one: Here, "the sanctionable conduct r[ose] to a truly egregious level."** *Id.,* at 975. **And when a litigant behaves that badly, the court opined, "all of the attorneys' fees incurred in the case [can] be awarded," without any need to find a "causal link between [those expenses and] the sanctionable conduct."** *Ibid.* As further support for *its decision,* the court considered the chances that full and timely disclosure of the test results would have affected Goodyear's settlement calculus. "While there is some uncertainty," the court stated, "the case more likely than not would have settled much earlier." *Id.,* at 972.

**Perhaps sensing thin ice, the District Court also made a "contingent award" in the event that the Court of Appeals reversed its preferred one. App. to Pet. for Cert. 180a. Here, the District Court recognized the possibility that a "linkage between [Goodyear's] misconduct and [the Haegers'] harm is required."** *Ibid.* If so, the court stated, its fee award should be reduced to $2 million. The deduction of $700,000, which was based on estimates Goodyear offered, represented fees that the Haegers incurred in developing claims against other defendants and proving their own medical damages. See App. 69.

**A divided Ninth Circuit panel affirmed the full $2.7 million award. According to the majority, the District Court acted properly in "award[ing] the amount [it] reasonably believed" the Haegers incurred in attorney's fees and costs "during the time when [Goodyear was] acting in bad faith." 813 F.3d 1233, 1250 (2016). Or repeated in just slightly different words: The District Court "did not abuse its discretion" in "award[ing] the Haegers all their attorneys' fees and costs in prosecuting the action once [Goodyear] began flouting [its] discovery obligations."** *Id.,* at 1249. Judge Watford disagreed. He would have demanded a "causal link between Goodyear's misconduct and the fees awarded." *Id.,* at 1255 (dissenting opinion). The only part of the District Court's opinion that might support such a connection, Judge Watford noted, was its hypothesis that disclosure of the test results would have produced an earlier settlement, and thus obviated the need for further legal expenses. But Judge Watford thought that theory unpersuasive: Because Goodyear would still have had plausible defenses to the Haegers' suit, "[i]t's anyone's guess how the litigation would have proceeded" had timely disclosure occurred.

*Ibid.* Accordingly, Judge Watford would have reversed the District Court for awarding fees beyond those "sustained *as a result of* Goodyear's misconduct." *Id.,* at 1256.

The Court of Appeals' decision created a split of authority: Other Circuits have insisted on limiting sanctions to fees or costs that are causally related to a **\*1186 litigant's misconduct.**[3] We therefore granted certiorari. 579 U.S. —— (2016).

## II

[2] [3] [4] **Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."** Link v. Wabash R. Co., 370 U.S. 626, 630–631, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). And one permissible sanction is an "assessment of attorney's fees"—an order, like the one issued here, instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by **the other side.** *Id.,* at 45, 111 S.Ct. 2123.

[5] [6] [7] **This Court has made clear that such a sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature. See** Mine Workers v. Bagwell, 512 U.S. 821, 826–830, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) **(distinguishing compensatory from punitive sanctions and specifying the procedures needed to impose each kind).**[4] **In other words, the fee award may go no further than to redress the wronged party "for losses sustained"; it may not impose an additional amount as punishment for the sanctioned party's misbehavior.** *Id.,* at 829, 114 S.Ct. 2552 (quoting *United States v. Mine Workers,* 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947)). **To level that kind of separate penalty, a court would need to provide procedural guarantees applicable in criminal cases, such as a "beyond a reasonable doubt" standard of proof. See** *id.,* at 826, 832–834, 838–839, 114 S.Ct. 2552. **When (as in this case) those criminal-type protections are missing, a court's shifting of fees is limited to reimbursing the victim.**

[8] [9] [10] **That means, pretty much by definition, that the court can shift only those attorney's fees incurred because of the misconduct at issue. Compensation for a wrong, after all, tracks the loss resulting from that wrong. So as**

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

we have previously noted, a sanction counts as compensatory only if it is "calibrate[d] to [the] damages caused by" the bad-faith acts on which it is based. *Id.,* at 834, 114 S.Ct. 2552. A fee award is so calibrated if it covers the legal bills that the litigation abuse occasioned. But if an award extends further than that—to fees that would have been incurred without the misconduct—then it crosses the boundary from compensation to punishment. Hence the need for a court, when using its inherent sanctioning authority (and civil procedures), to establish a causal link—between the litigant's misbehavior and legal fees paid by the opposing party.[5]

**\*1187** [11] [12] That kind of causal connection, as this Court explained in another attorney's fees case, is appropriately framed as a but-for test: The complaining party (here, the Haegers) may recover "only the portion of his fees that he would not have paid but for" the misconduct. *Fox v. Vice,* 563 U.S. 826, 836, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011); see *Paroline v. United States,* 572 U.S. ——, ——, 134 S.Ct. 1710, 1722, 188 L.Ed.2d 714 (2014) ("The traditional way to prove that one event was a factual cause of another is to show that the latter would not have occurred 'but for' the former"). In *Fox,* a prevailing defendant sought reimbursement under a fee-shifting statute for legal expenses incurred in defending against several frivolous claims. See 563 U.S., at 830, 131 S.Ct. 2205; 42 U.S.C. § 1988. The trial court granted fees for all legal work relating to those claims—regardless of whether the same work would have been done (for example, the same depositions taken) to contest the *non-*frivolous claims in the suit. We made clear that was wrong. When a "defendant would have incurred [an] expense in any event[,] he has suffered no incremental harm from the frivolous claim," and so the court lacks a basis for shifting the expense. *Fox,* 563 U.S., at 836, 131 S.Ct. 2205. Substitute "discovery abuse" for "frivolous claim" in that sentence, and the same thing goes in this case. Or otherwise said (and again borrowing from *Fox* ), when "the cost[ ] would have been incurred in *the absence of*" the discovery violation, then the court (possessing only the power to compensate for harm the misconduct has caused) must leave it alone. *Id.,* at 838, 131 S.Ct. 2205.

[13] [14] [15] [16] [17] This but-for causation standard generally demands that a district court assess and allocate specific litigation expenses—yet still allows it to exercise discretion and judgment. The court's fundamental job is to determine whether a given legal fee—say, for taking a deposition or drafting a motion—would or would not have been incurred in the absence of the sanctioned conduct. The award is then the sum total of the fees that, except for the misbehavior, would not have accrued. See

*id.,* at 837–838, 131 S.Ct. 2205 (providing illustrative examples). But as we stressed in *Fox,* trial courts undertaking that task "need not, and indeed should not, become green-eyeshade accountants" (or whatever the contemporary equivalent is). *Id.,* at 838, 131 S.Ct. 2205. "The essential goal" in shifting fees is "to do rough justice, not to achieve auditing perfection." *Ibid.* Accordingly, a district court "may take into account [its] overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Ibid.* The court may decide, for example, that all (or a set percentage) of a particular category of expenses—say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct. And such judgments, in light of the trial court's "superior understanding of the litigation," are entitled to substantial deference on appeal. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

[18] [19] [20] In exceptional cases, the but-for standard even permits a trial court to shift all of a party's fees, from either the start or some midpoint of a suit, in one fell swoop. *Chambers v. NASCO* offers one illustration. There, we approved such an **\*1188** award because literally everything the defendant did—"his entire course of conduct" throughout, and indeed preceding, the litigation—was "part of a sordid scheme" to defeat a valid claim. 501 U.S., at 51, 57, 111 S.Ct. 2123 (brackets omitted). Thus, the district court could reasonably conclude that all legal expenses in the suit "were caused ... solely by [his] fraudulent and brazenly unethical efforts." *Id.,* at 58, 111 S.Ct. 2123. Or to flip the example: If a plaintiff initiates a case in complete bad faith, so that every cost of defense is attributable only to sanctioned behavior, the court may again make a blanket award. And similarly, if a court finds that a lawsuit, absent litigation misconduct, would have settled at a specific time—for example, when a party was legally required to disclose evidence fatal to its position—then the court may grant all fees incurred from that moment on. In each of those scenarios, a court escapes the grind of segregating individual expense items (a deposition here, a motion there)—or even categories of such items (again, like expert discovery)—but only because all fees in the litigation, or a phase of it, meet the applicable test: They would not have been incurred except for the misconduct.

### III

It is an oddity of this case that both sides agree with just about everything said in the last six paragraphs about the pertinent law. Do legal fees awarded under a court's

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

inherent sanctioning authority have to be compensatory rather than punitive when civil litigation procedures are used? The Haegers and Goodyear alike say yes. Does that mean the fees awarded must be causally related to the sanctioned party's misconduct? A joint yes on that too. More specifically, does the appropriate causal test limit the fees, a la *Fox*, to those that would not have been incurred but for the bad faith? No argument there either. **And in an exceptional case, such as *Chambers*, could that test produce an award extending as far as all of the wronged party's legal fees?** Once again, agreement (if with differing degrees of enthusiasm). See Brief for Petitioner 17, 23–24, 31; Brief for Respondents 17–18, 22–23; Tr. of Oral Arg. 34–35, 46–47.

All the parties really argue about here is what that law means for this case. Goodyear contends that it requires throwing out the trial court's fee award and instructing the court to consider the matter anew. The Haegers maintain, to the contrary, that the award can stand. They initially contend—pointing to a couple of passages from the Ninth Circuit's opinion—that both courts below articulated and applied the very but-for causation standard we have laid out. See Brief for Respondents 17–18 (highlighting the Ninth Circuit's statements that Goodyear's "bad faith conduct caused significant harm" and that the District Court "determine[d] the appropriate amount of fees to award as sanctions to compensate the [Haegers] for the damages they suffered as a result of [Goodyear's] bad faith"). And even if we reject that view, the Haegers continue, **we may uphold the fee award on the ground that it in fact passes a but-for test. That standard is satisfied** (so they say) for either of two reasons. First, because the case would have settled as soon as Goodyear disclosed the requested heat-test results, thus putting an end to the Haegers' *legal bills*. Or second, because (settlement prospects aside) the withholding of that data so infected the lawsuit as to account for each and every expense the Haegers subsequently incurred. See *id.*, at 14–15, 22, 26.

[21] [22] [23] The Haegers' defense of the lower courts' reasoning is a non-starter: Neither of them used the correct legal standard. As earlier recounted, the District **\*1189** Court specifically disclaimed the "usual [ ]" need *to find a "causal link" between misconduct and fees when* the sanctioned party's behavior was bad enough—in the **court's words, when it "r [ose] to a truly egregious level."** 906 F.Supp.2d, at 975 (emphasis deleted); see *supra*, at 1185. In such circumstances, the court thought, it could award "all" fees, including those that would have been incurred in the absence of the misconduct. 906 F.Supp.2d, at 975. And the court confirmed that approach even while conceding that it might be wrong: By issuing a "contingent award" of \$2 million, meant to go into effect

if the Ninth Circuit demanded a causal "linkage between the misconduct and harm," the District Court made clear that its primary, \$2.7 million award was not so confined. App. to Pet. for Cert. 180a; see *supra*, at 1185. Still, the Court of Appeals left the larger sanction in place, because it too mistook what findings were needed to support that award. In the Ninth Circuit's view, the trial court could grant all attorney's fees incurred "*during the time when* [Goodyear was] acting in bad faith." 813 F.3d, at 1250 (emphasis added); see *id.*, at 1249 (permitting an award of fees incurred "*once* [Goodyear] began flouting [its] discovery obligations" (emphasis added)); *supra*, at 1185. But that is a temporal limitation, not a causal one; and, like the District Court's "egregiousness" requirement, it is wide of the mark. A sanctioning court must determine which fees were incurred because of, and solely because of, the misconduct at issue (however serious, or concurrent with a lawyer's work, it might have been). No such finding lies behind the \$2.7 million award made and affirmed below.

[24] Nor are we tempted to fill in that gap, as the Haegers have invited us to do. As an initial matter, the Haegers have not shown that this litigation would have settled as soon as Goodyear divulged the heat-test results (thus justifying an all-fees award from the moment it was supposed to disclose, see *supra*, at 1187 – 1188). Even the District Court did not go quite that far: In attempting to buttress its comprehensive award, it said only (and after expressing "some uncertainty") that the suit probably would have settled "much earlier." 906 F.Supp.2d, at 972. And that more limited finding is itself subject to grave doubt, even taking into account the deference owed to the trial court. As Judge Watford reasoned, the test results, although favorable to the Haegers' version of events, did not deprive Goodyear of colorable defenses. In particular, Goodyear still could have argued, as it had from the beginning, that "the Haegers' own tire, which had endured more than 40,000 miles of wear and tear, failed **because it struck road debris.**" 813 F.3d, at 1256 (dissenting opinion). And indeed, that is pretty much the course Goodyear took in another suit alleging that the G159 caused a motorhome accident. See *Schalmo v. Goodyear*, No. 51–2006–CA–2064–WS (Fla. Cir. Ct., 6th Cir., Pasco County). In that case (as Judge Watford again observed), Goodyear produced the very test results at issue here, yet still elected to go to trial. See 813 F.3d, at 1256. So we do not think the record allows a finding, as would support the \$2.7 million award, that disclosure of the heat-test results would have led straightaway to a settlement.

[25] Further, the Haegers cannot demonstrate that Goodyear's non-disclosure so permeated the suit as to

Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

make that misconduct a but-for cause of every subsequent legal expense, totaling the full $2.7 million. If nothing else, the District Court's back-up fee award belies that theory. After introducing a causal element into the equation, the court found that the $700,000 of fees that the Haegers incurred **1190** in litigating against other defendants and proving their own medical damages had nothing to do with Goodyear's discovery decisions. See App. to Pet. for Cert. 180a; *supra*, at 1185. The Haegers have failed to offer any concrete reason for questioning *that judgment, and we do not see how they could. At a* minimum, then, the sanction order could not force Goodyear to reimburse those expenses—because, again, the Haegers would have paid them even had the company behaved immaculately in every respect.

[26] That leaves the question whether the contingent $2 million award should now stand—or, alternatively, whether the District Court must reconsider from scratch which fees to shift. In the absence of any waiver issue, we would insist on the latter course. Although the District Court considered causation in arriving at its back-up award, we cannot tell from its sparse discussion whether its understanding of that requirement corresponds to the standard we have described. That uncertainty points toward demanding a do-over, under the unequivocally right legal rules. But the Haegers contend that Goodyear has waived any ability to challenge the $2 million award. In their view, that sum reflected Goodyear's own submission—which it may not now amend—that only about $700,000 of the fees sought would have been

incurred "regardless of Goodyear's behavior." App. 69; see Brief for Respondents 41; *supra*, at 1185. The Court of Appeals did not previously address that issue, and we decline to decide it in the first instance. See *Cutter v. Wilkinson*, 544 U.S. 709, 718, n. 7, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) ("[W]e are a court of review, not of first view"). The possibility of waiver should therefore be the initial order of business below. If a waiver is found, that is the end of this case. If not, the District Court must reassess fees in line with a but-for causation requirement.

For these reasons, we reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice GORSUCH took no part in the consideration or decision of this case.

### All Citations

137 S.Ct. 1178, 197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665, 2017 Daily Journal D.A.R. 3692, 26 Fla. L. Weekly Fed. S 534

Footnotes

*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1   The additional defendants named in the Haegers' complaint were Gulf Stream Coach, the manufacturer of the motorhome, and Spartan Motors, the manufacturer of the vehicle's chassis. In the course of the litigation, the Haegers reached a settlement with Gulf Stream, and the District Court granted Spartan's motion for summary judgment.

2   The court reasoned that no statute or rule enabled it to reach all the offending behavior. Sanctions under Federal Rule of Civil Procedure 11, the court thought, should not be imposed after final judgment in a case. See 906 F.Supp.2d 938, 973, n. 24 (D.Ariz.2012). And sanctions under 28 U.S.C. § 1927, it noted, could address the wrongdoing of only Goodyear's attorneys, rather than of Goodyear itself. See 906 F.Supp.2d, at 973.

3   See, *e.g.*, *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 808 (C.A.8 2005); *Bradley v. American Household, Inc.*, 378 F.3d 373, 378 (C.A.4 2004); *United States v. Dowell*, 257 F.3d 694, 699 (C.A.7 2001).

4   *Bagwell* also addressed "coercive" sanctions, designed to make a party comply with a court order. 512 U.S., at 829, 114 S.Ct. 2552. That kind of sanction is not at issue here.

5   Rule-based and statutory sanction regimes similarly require courts to find such a causal connection before shifting fees. For example, the Federal Rules of Civil Procedure provide that a district court may order a party to pay attorney's fees "caused by" discovery misconduct, Rule 37(b)(2)(C), or "directly resulting from" misrepresentations in pleadings, motions, and other papers, Rule 11(c)(4). And under 28 U.S.C. § 1927, a court may require an attorney who

**Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017)**

197 L.Ed.2d 585, 85 USLW 4197, 17 Cal. Daily Op. Serv. 3665...

unreasonably multiplies proceedings to pay attorney's fees incurred "because of" that misconduct. Those provisions confirm the need to establish a causal link between misconduct and fees when acting under inherent authority, given that such undelegated powers should be exercised with especial "restraint and discretion." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

Virginia Properties, LLC v. T-Mobile Northeast LLC, --- F.3d ---- (2017)

2017 WL 3197539
Only the Westlaw citation is currently available.
*United States Court of Appeals,
Second Circuit.*

**VIRGINIA PROPERTIES, LLC,
Plaintiff-Appellant,
v.
T-MOBILE NORTHEAST LLC,
Defendant-Appellee,**
Skyline Steel Fabricators & Erectors, Inc., AKA
Skyline Steel Fabricators & Erectors, LLC,
**Innovative Engineering, Inc., Third-Party
Defendants-Cross-Defendants-Cross-Claimants-A
ppellees,
KMB Design Group, LLC, Appellee,
T-Mobile US, Inc., Omnipoint Communications,
Inc., Defendants-Third-Party
Plaintiffs-Cross-Defendants.**

Docket No. 16-2973
|
**August Term, 2016**
|
Argued: June 12, 2017
|
Decided: July 28, 2017

**Synopsis**
**Background:** Building owner brought action against telecommunications company that leased space on the roof of building for cell tower equipment, seeking to recover for property damage caused by the equipment. The *United States District Court for the Southern District of New York,* Hellerstein, J., granted company's motion for sanctions. Owner appealed.

**Holdings:** The Court of Appeals, Vilardo, District Judge, sitting by designation, held that:

[1] district court abused its discretion by imposing sanctions on grounds that owner failed to disclose relevant documents;

[2] district court abused its discretion by imposing sanctions on grounds of an "apparent forgery" of engineer's original report; and

[3] district court abused its discretion by imposing

sanctions on grounds that owner included unrelated repair expenses in its alleged damages in a bad faith attempt to double its recovery.

Vacated and remanded.

West Headnotes (7)

[1] **Federal Courts**
⟜Sanctions

Court of Appeals reviews all aspects of a district court's decision to impose sanctions for abuse of discretion, but it requires a high degree of specificity in the factual findings of lower courts upon which sanctions for bad faith are based.

1 Cases that cite this headnote

[2] **Federal Courts**
⟜Abuse of discretion in general

A district court necessarily abuses its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.

Cases that cite this headnote

[3] **Federal Courts**
⟜Sanctions

A district court's imposition of sanctions is improper when the court's order cannot be located within the range of permissible decisions.

Cases that cite this headnote

[4]     **Federal Civil Procedure**
⇌Monetary Sanctions
**Federal Civil Procedure**
⇌Proceedings
**Federal Civil Procedure**
⇌Evidence

Sanctions beyond those that are causally, and not simply temporally, related to the *sanctionable conduct are punitive rather than* compensatory and therefore may not be imposed without procedural guarantees applicable in criminal cases, such as a beyond a reasonable doubt standard of proof.

1 Cases that cite this headnote

[5]     **Federal Civil Procedure**
⇌Discovery motions

**In building owner's action against telecommunications company that leased space** on building's roof for cell tower equipment, seeking to recover for property damage caused by the equipment, district court abused its *discretion by imposing sanctions against owner* under its inherent authority on grounds that owner failed to disclose relevant documents; while there was a delay in the disclosure of certain documents showing that a contractor was performing repairs that were unrelated to any damage caused by company's equipment, there was evidence that owner provided the documents to its attorneys, who failed to disclose them, and the documents were disclosed after owner obtained new attorney, and nothing indicated that owner possessed or knew about engineer's report produced in response to a third-party subpoena, which allegedly showed existence of hidden, unrelated repairs.

Cases that cite this headnote

[6]     **Federal Civil Procedure**
⇌Other particular conduct

**In action by building owner, a limited liability company (LLC), against telecommunications company that leased space on building's roof for cell tower equipment, seeking to recover for property damage caused by the equipment,** district court abused its discretion by imposing sanctions against owner under its inherent authority on grounds of an "apparent forgery" of engineer's original report; there was no evidence *that owner's manager told engineer to alter* "9-Point Report," which detailed all repairs needed for the building, evidence showed that "4-Point Report" was a document that engineer created in an attempt to specifically give company their portion of the repairs, and "4-Point Report" did not contain the **embellishments alleged by company.**

Cases that cite this headnote

[7]     **Federal Civil Procedure**
⇌Prayers for damages or other relief

In action by building owner, a limited liability company (LLC), against telecommunications company that leased space on building's roof for cell tower equipment, seeking to recover for property damage caused by the equipment, district court abused its discretion by imposing sanctions against owner under its inherent authority on grounds that owner included unrelated repair expenses in its alleged damages in a bad faith attempt to double its recovery; contrary to company's assertion, engineer did not testify that challenged repairs, including brickpointing, lintel work, and wall repairs, had "nothing to do" with company's equipment, at worst, engineer's testimony was ambiguous on whether the challenged repairs were necessitated by damage related to company's equipment, and documents relating to owner's rent increase and tax abatement applications appeared to be largely consistent with owner's theory on **damages.**

Cases that cite this headnote

Virginia Properties, LLC v. T-Mobile Northeast LLC, --- F.3d ---- (2017)

Appeal from the United States District Court for the Southern District of New York

**Attorneys and Law Firms**

KENNETH E. LEE (Seth L. Levine, Christos G. Papapetrou, **on the brief), Levine Lee LLP, New York,** NY, for Plaintiff-Appellant Virginia Properties, LLC.

ROBERTA KAPLAN (Darren W. Johnson, **on the brief),** Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant-Appellee T-Mobile Northeast LLC.

**Also on the brief:** Daniel C. Folchetti, **Law Office of Lori** D. **Fishman, Tarrytown,** NY, for Third-Party Defendants-Cross-Defendants-Cross-Claimants-Appellees **Innovative Engineering, Inc.;** Patrick W. Brophy, McMahon, Martine & Gallagher, LLP, Brooklyn, NY, for Third-Party Defendants-Cross-Defendants-Cross-Claimants-Appellees Skyline Steel Fabricators & Erectors, Inc.

JOYCE E. BOYLE, McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, NY, for Appellee KMB Design Group, LLC.
Before: CALABRESI, POOLER, **Circuit Judges, and** VILARDO, District Judge.[1]

**Opinion**

VILARDO, District Judge:

**\*1 In April of this year—long after the district court's** imposition of sanctions in the case before us—the Supreme Court addressed "a federal court's inherent authority to sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees." *Goodyear Tire & Rubber Co. v. Haeger*, —— U.S. ——, 137 S.Ct. 1178, 1183-84, 197 L.Ed.2d 585 (2017). **The Court held** "that such an order is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith." *Id.* at 1184. **Because the** district court's order of sanctions in this case is in serious tension with that holding—and because we find that the district court was misled by the defendants' submissions in awarding such severe sanctions—we VACATE the court's judgment and REMAND for further proceedings consistent with this decision.

**BACKGROUND**

Plaintiff-appellant Virginia Properties, LLC, appeals from a final judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*). Virginia **Properties commenced this action in April 2013, seeking** to recover for property damage to its apartment building in the Bronx. T-Mobile Northeast LLC ("T-Mobile") had leased space on the roof of the building for cell tower equipment, which both sides agreed caused some damage to the building. While T-Mobile never admitted **responsibility for a particular damage amount, it offered** to settle with Virginia Properties for $350,000, the amount T-Mobile believed was reasonably related to the damage caused by its equipment. But Virginia Properties declined, claiming that the damage caused by T-Mobile's **equipment was more extensive. And so the case became a** dispute about just how much damage T-Mobile had caused.

After a somewhat lengthy period of discovery, T-Mobile and the third-party defendants, Skyline Steel Fabricators & Erectors, Inc., and Innovative Engineering, Inc., moved for sanctions. According to T-Mobile and the third-party defendants (collectively, the "defendants"), Virginia Properties committed an "elaborate and pervasive fraud on the Court." App'x at 244. They claimed that the fraud included attributing to T-Mobile damages that were unrelated to its equipment, withholding documents that evidenced this duplicity, and even falsifying documents to bolster the plaintiff's claim. The district court agreed, **finding that "[t]here was clearly a pattern of misbehavior** by plaintiff in this case." Special App'x at 10. By an order filed April 12, 2016, the court granted the motions·for sanctions.

**Relying on its inherent powers and 28 U.S.C. § 1927, the** court dismissed the complaint with prejudice and said that it would require Virginia Properties or its counsel to pay a fine and all their adversaries' litigation costs and attorney's fees. *Id.* at 10-11. After further submissions from the three sets of attorneys who at various times had represented Virginia Properties, "to determine the responsibility of each party for sanctions," *id.*, the district court issued a final order, filed August 18, 2016. The court found Virginia Properties solely liable for a $75,000 fine and **$607,493.08 in fees, costs, and expenses** (including $21,554.75 to non-party-appellee KMB Design Group, LLC ("KMB")). *Id.* at 68-69.

**\*2 The reasoning behind the district court's ruling was** primarily set forth in the 11-page order that was filed on April 12 and initially granted the sanctions motions. The facts offered to support the district court's decision fall into three categories: (1) "failures to disclose clearly

relevant documents," (2) the "apparent forgery of other documents," and (3) a "bad faith attempt to double [the plaintiff's] potential recovery." *Id.* at 6. After the court issued its final order in August 2016—dismissing the case, fining the plaintiff $75,000, and ordering the plaintiff to reimburse all attorney's fees and costs for the defendant, third-party defendants, and non-party KMB—the plaintiff appealed.

### DISCUSSION

### I. Appellate Review of Sanctions
[1] [2] [3]"We review all aspects of a [d]istrict [c]ourt's decision to impose sanctions for abuse of discretion." *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999). But we require "a high degree of specificity in the factual findings of lower courts" upon which sanctions for bad faith are based. *Weinberger v. Kendrick*, 698 F.2d 61, 80 (2d Cir. 1982). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Schlaifer Nance & Co.*, 194 F.3d at 333 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)). The imposition of sanctions also is improper when the court's order "cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

We have recognized that "the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard that informs its determination as to whether sanctions are warranted." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir. 2000) (quotation omitted). We are particularly cognizant of that here, where some sanctions may be warranted. Nevertheless, because the record² has left us "with the definite and firm conviction that a mistake has been committed," *Zervos*, 252 F.3d at 168 (quotation omitted), we find that the district court exceeded the bounds of its discretion in imposing the severe sanctions in this case.

The defendants convinced the district court that Virginia Properties committed a fraud on the court. But a careful inspection of the record convinces us that notwithstanding the defendants' rhetoric and accusations, there is no evidence of fraud. We therefore vacate the sanction of dismissal and the fine.

We also vacate and remand the award of costs and

attorney's fees. There is no question that some discovery material was provided late in the game and that sanctions may have been appropriate for that discovery abuse. But there is a real question about whether any such sanctions should have been assessed against Virginia Properties or against its prior counsel. The district court's initial instinct was to hold a hearing on that issue, and that instinct was a good one.

[4]What is more, under the Supreme Court's recent decision in *Goodyear*, the award of *all* costs and attorney's fees cannot stand because it was not causally related to the late discovery. *See* 137 S.Ct. at 1186-88. The Court made clear in *Goodyear* that an award of costs and attorney's fees and sanctions must be related *causally*—and not simply *temporally*—to the sanctionable conduct. *Id.* at 1189. Sanctions beyond that are punitive rather than compensatory and therefore may not be imposed without "procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof." *Id.* at 1186. Because the district court here did essentially what the district court did in *Goodyear*—awarded all costs and attorney's fees for what the court found was particularly egregious conduct—its decision was legally unsound. Even more basically, because the finding of particularly egregious conduct was not supported by the record, the decision was factually unsound as well.

*3 Given the complexity of the facts, including those upon which the district court relied to impose sanctions, we offer the following detailed explanation for our decision.

### II. The Bases for Sanctions

#### A. "Failures to Disclose Clearly Relevant Documents"
[5]Either Virginia Properties or its counsel failed to disclose relevant documents that—in the district court's words—would have shown "the full extent and nature of the repairs to [the] property." Special App'x at 1. The district court considered the undisclosed documents to be particularly important for two reasons.

First, certain documents that should have been produced early in the litigation revealed that the contractor, DNS Construction ("DNS"), was performing some repairs to the building that were unrelated to any damage caused by T-Mobile's cellular equipment. *See id.* at 3 ("None of the exhibits [attached to the complaint] suggest or admit that any of the work performed [by DNS] was unrelated to the damage allegedly caused by T-Mobile."); *see also* App'x

at 254 (declaration in support of sanctions motion, arguing that these documents "revealed—for the first time—that work had been done at the Building that was not related to T-Mobile"). In other words, those documents showed that there actually were "two categories of work," and the failure to disclose those documents—according to the district court—demonstrated "bad faith." Special App'x at 7.

Second, certain documents created later in the litigation, in connection with Virginia Properties' rent increase ("MCI") and tax abatement ("J-51") applications, attributed about $320,000 of the total price tag for the repairs to "brickpointing, waterproofing, and lintel work," which the district court found had " 'nothing to do' with T-Mobile." *Id.* at 8; *see also id.* at 3-4 ("[W]ork listed in the suppressed documents, including brickpointing, lintel work, and wall repairs, ... cannot credibly be attributed to ... T-Mobile.").

As discussed further below, the district court was mistaken in its understanding of the significance of the undisclosed documents, especially those describing repairs as brick pointing, waterproofing, and lintel work. In fact, those documents are, at a minimum, consistent with T-Mobile's liability for those repairs (or at least most of them). For that reason, the failure to disclose documents showing *any* unrelated repairs is of the most concern, because that certainly might have prolonged discovery to some extent (e.g., T-Mobile's taking depositions without knowing about the unrelated repairs). But much of the blame for those disclosure failures may well lie with the Virginia Properties' previous attorneys.

Indeed, prior to beginning depositions in this case, Robert Spring, *the managing member of Virginia Properties,* provided documents to his attorneys for purposes of responding to discovery demands, which showed (1) that DNS was performing some unrelated repairs to the building at the same time as the T-Mobile repairs, and (2) that Spring had asked non-party engineer Ted Yen to produce one set of documents for the unrelated repairs and a separate set of documents for the T-Mobile repairs. The documents that Spring provided to his attorneys included:

> **\*4** • a **"Memo to the file,"** which (1) described repairs that DNS was to perform to the rear of the building due to "substantial wear," (2) distinguished those repairs from T-Mobile repairs, and (3) *explained that it would be economical to perform all the repairs at once,* App'x at 336;
>
> • two sets of Yen's construction drawings, with one 4-page set concerning repairs to the building as a

whole and one 4-page set concerning only T-Mobile repairs, *id.* at 1145-52; and

• emails between Spring and Yen, including an email dated June 18, 2012, in which Spring asks for "a COMPLETE set of drawings for T Mobile [sic] work" and a "COMPLETE set of drawings for the other work," *id.* at 338; and an email dated March 18, 2012, in which Spring asked for "2 sets of **drawings,"** *id.* at 341.

The record shows that on June 5, 2014, Spring provided his then-attorneys, Lamb & Barnosky, with the "Memo to the file" and the construction drawings. And on August 27, 2014, Spring provided Lamb & Barnosky with the Yen emails. Despite that, Lamb & Barnosky failed to *produce those documents or a privilege log prior to* Spring's deposition in October 2014, and the deposition apparently revealed these disclosure failures to T-Mobile. Eventually, on December 10, 2014—and in response to T-Mobile's additional discovery demands—Lamb & Barnosky produced more than 1000 pages of additional documents that included the Yen emails, but not the other documents listed above.

According to the Lamb & Barnosky attorneys, the reason they did not disclose the "Memo to the file" is because they deemed it not to be responsive. *Id.* at 1043, 1048 ("Since this document involved repairs to the rear of the building and were not part of the 'T-Mobile work going on ...' [sic] the memo was not disclosed at that time."). They disclosed only one of the two sets of construction drawings because they did not realize that the drawings were different (i.e., the drawings look very much like versions or drafts of the same thing, with the pages in both sets of drawings labeled "T-100.00," "G-100.00," "A-100.00," and "A-101.00"). *See id.* at 1042-43, 1072. And their excuse for not disclosing the Yen emails was their focus on other things—i.e., "[their] client's emphasis on preparing for the depositions and [because] a comprehensive privilege log had to be prepared." *Id.* at 1076.

**\*5** At least in part because of those issues, the relationship between Virginia Properties and Lamb & Barnosky soured, as the contemporaneous emails between Mark Spring and the attorneys make clear. Indeed, those emails seem to reveal not bad faith on the part of Virginia Properties, but instead surprise and frustration at the lack of earlier disclosure. *See, e.g., id.* at 2357 (Mark Spring: "According to our records the emails at issue were *provided to your office on August 27, 2014, well before* my father's deposition. Is Rapaport correct that they were not produced until after the deposition?"); *id.* at 2352 (Mark Spring: "[T]hese emails were not privileged in any

Virginia Properties, LLC v. T-Mobile Northeast LLC, --- F.3d ---- (2017)

way, so I fail to see how the privilege log"—i.e., the purported reason for the late disclosure—"relates to this issue."). Those emails also appear to show how Lamb & Barnosky made bad matters worse for Virginia Properties by, in front of the district court, taking an unreasonable position on whether to schedule a further deposition of Robert Spring.[7]

On April 2, 2015, Virginia Properties replaced Lamb & Barnosky with attorney Michael Cibella, who disclosed additional documents, including: on April 14, 2015, the two sets of construction drawings (with added handwritten labels); and on May 1, 2015, the "Memo to the file." Those disclosures were made pursuant to a court order. At around the same time, T-Mobile also uncovered another document that T-Mobile interpreted as revealing the existence of hidden, unrelated repairs to the building—Yen's "9-Point Report," which Yen produced in response to a third-party subpoena.

Unlike the other documents discussed above, Virginia Properties did not provide the 9-Point Report to its counsel. But there is no clear evidence that Virginia Properties should have, either. Indeed, it is not clear when, if ever, Virginia Properties received the 9-Point Report. The report is dated February 23, 2012, and is addressed from Yen to Tariq Tahir of contractor DNS. The report does not indicate that a copy was sent to Spring, *see id.* at 319, which makes sense because at that time, Yen had not yet met or been retained by Spring. *Although it is possible that Yen later sent the 9-Point Report to Spring, the testimony on that point is equivocal. See id.* at 357-58;[9] *id.* at 542;[10] *id.* at 732.[10] **And unlike other documents in the record, there is no evidence (such as emails, etc.) showing that Spring possessed or even knew about the 9-Point Report at any relevant time. So it may be that Virginia Properties never had the 9-Point Report to produce.**

**\*6** Given the above, it is easy to understand why T-Mobile—and the district court, relying on T-Mobile's representations—may have viewed Virginia Properties with suspicion. It would have appeared that Virginia Properties failed to disclose any of the above-described documents[11] until after having been caught red-handed at Spring's deposition. And even then, it took a few more months, a court order, a third-party subpoena, and a third set of lawyers for Virginia Properties to disclose the rest of the documents. But the further submissions from Virginia Properties and its attorneys raise a real question about whether Virginia Properties or its prior counsel were to blame for the late disclosure. And the more complete excerpts of Yen's deposition testimony attached to those submissions dispel any doubt that T-Mobile's

over-the-top rhetoric was largely baseless.

**B. "Apparent Forgery"**

[6]The district court used the term "apparent forgery" to refer to "documents that were changed or created specifically to shift the cost of construction work to T-Mobile." Special App'x at 6-7; *see also id.* at 68 (final order of August 18, 2016, finding "manipulation of discoverable documents to mask the fraud"). The district court's April 12 decision discusses in detail "[o]ne striking example" of this, which involves comparing the "9-Point Report" and the "4-Point Report" (as the parties label them on appeal) of third-party engineer Ted Yen. *Id.* at 7. But this portion of the district court's decision is clearly erroneous.

According to the district court:

> The altered [i.e., 4-Point] report includes additions not found in the original [9-Point] report as well, apparently inserted by Spring or his agents *after* Yen produced the second report, including allegations of negligence, and reports of water leakage through the roof. Yen testified he never opined on either of those topics, or included them in *any report.*

*Id.* at 7 (emphasis in original).

The district court appears to have been misled by the declaration of defense counsel, Marc A. Rapaport, which was submitted in support of the sanctions motion. Paragraph 34 of the Rapaport Declaration, which the district court cited and borrowed from, reads as follows:

> In his May 2015 deposition testimony, Yen stated that Spring told him to alter his report "specifically for T-Mobile." These alterations included (i) deleting references to the Project's non-T-Mobile components (brick pointing, waterproofing, brickwork, lintel replacement, window sill replacement and rear-wall repair); and (ii) adding embellishments, including allegations of water leakage and negligence, that were not in the Actual Yen Report and

Virginia Properties, LLC v. T-Mobile Northeast LLC, --- F.3d ---- (2017)

that Yen has since contradicted in
his sworn deposition testimony.

App'x at 253, ¶34 (citations omitted).

Initially, there is no evidence that Spring "told" Yen to
"alter" the 9-Point Report as part of some cover-up. In
fact, there is no clear evidence that Spring and Yen ever
**specifically discussed the 9-Point Report at all.**[12] **The cited
Yen testimony simply supports the undisputed—and,
without more, innocent—fact that Spring asked Yen for
one set of documents showing only the repairs attributable
to T-Mobile, and one set of documents showing the
unrelated repairs.** *Id.* at 365 ("The owner requested me to
write it, to specifically give [T-Mobile] their portion of it,
and that's what I did."); *see also id.* at 364 (asked why the
report addressed only four items, Yen answered "Because
it's the same thing, why are we muddling the issue, we
did this, we did this. T-Mobile doesn't care about, oh, the
roof has to be replaced ...").

*7 Next, there were no "embellishments," *id.* at 253, in
the 4-Point Report. According to the Rapaport
Declaration, the embellishments "include[d] allegations of
water leakage and negligence, that were not in the Actual
Yen Report [i.e., the 9-Point Report] and that Yen has
since contradicted in his sworn deposition testimony." *Id.*
But the 4-Point Report does not even mention
"negligence," *see id.* at 321, so Yen could not have
contradicted it on that issue. And although the 4-Point
Report discusses water leakage, the testimony cited by
defense counsel and the court does not show Yen
disavowing or contradicting that part of the report. In fact,
none of the deposition testimony cited in the Rapaport
Declaration provides any support for the claims of
"embellishments."

It is worth noting that the 4-Point Report *does* say that
T-Mobile's cell tower was "overloading" the parapet wall
and "causing" damage to the plaintiff's building. *Id.* So to
the district court, the Rapaport Declaration's use of the
term "negligence" might have appeared to be mere
semantics. But it was not. Not only is there no opinion
concerning "negligence" in the 4-Point Report, but on the
very next page of the deposition transcript—i.e., after the
page cited in the Rapaport Declaration and the district
court's decision—Yen's testimony makes it crystal clear
*that he was not, in any way, disavowing his opinions in*
the 4-Point Report:

> And if the wording is different
> [from the 9-Point Report], the
> wording is different, but I opined
> that T-Mobile was attributable for

the parapet wall moving, which is
even written in [the 9-Point
Report]. It might have been slightly
different words, but it's *still the
same context.*

*Id.* at 2435. And immediately after that:

> **Q. Did you ever imply that bricks and masonry were
> falling because of T-Mobile and no other reason?**
>
> A. Yes, like I said, when you asked me about the
> picture and the back wall, I said the bricks were
> falling and it could have been attributable to the wall
> moving forward by T-Mobile's equipment pulling it.

*Id.* at 2435. Thus, Yen consistently said that T-Mobile
caused the parapet wall to move, which caused or may
have caused damage; the 4-Point Report was not
"embellish[ed]." *See id.* at 253, ¶34.

The excerpt of Yen's deposition testimony attached to
T-Mobile's sanctions motion omitted pages 194 and 195,
which included the testimony above. Instead, T-Mobile
attached and directed the district court's attention to the
discussion of negligence on page 193, which was a red
herring. Even more disturbing—given that punitive
sanctions are akin to a criminal penalty—T-Mobile also
omitted the portion of Yen's testimony where Yen was
asked point blank who wrote the 4-Point Report:

> Q. Who changed the wording from the nine-bullet
> point to the four-bullet point?
>
> A. That would be me because it was specifically
> written just for the T-Mobile section. Why would
> they want to read the whole letter here?
>
> Q. Did you have any help?
>
> A. No.
>
> Q. Did anybody suggest any language?
>
> A. Did anybody suggest any, no.

*Id.* at 2436.

Thus, T-Mobile's entire "forgery" story was not just
unsupported; it actually was contradicted by the record.
All that the evidence shows is that the 4-Point Report was
a document that Yen himself created in an attempt "to
specifically give [T-Mobile] their portion" of the repairs.
*Id.* at 365. We have found no evidence in the record
showing that any documents were forged.

## C. "Bad Faith Attempt to Double [the] Recovery"

[7]Virginia Properties sought approximately $700,000 from T-Mobile, consistent with its position that most of the repairs performed by DNS were attributable to T-Mobile's cell tower equipment.[13] The district court essentially found that to be frivolous and "that the plaintiff, and its managing member Spring, intentionally included unrelated expenses in their alleged damages in this lawsuit in order to nearly double their potential recovery." *Special App'x at 6. The Supreme Court's recent decision in Goodyear suggests that (1) if the district court's findings were correct, and (2) if T-Mobile offered to settle for the entire amount of damages actually attributable to its cellular equipment, then continuing this litigation solely to harass or to obtain a windfall might well have been sanctionable conduct supporting an award of all costs and attorney's fees. But there is no evidence that the plaintiff's position on damages is frivolous.* As with the "apparent forgery," the district court's findings on this issue relied on the Rapaport Declaration's inaccurate characterization of Yen's testimony.

**\*8** The district court found that "[s]everal categories of work listed in the suppressed documents, including brickpointing, lintel work, and wall repairs ... cannot credibly be attributed to damage that could have been caused by the cell tower equipment that T-Mobile stored on the roof of plaintiff's property." *Id.* at 3–4. Citing all 20 pages of Yen's testimony attached to the Rapaport Declaration, the district court further found that "brickpointing, waterproofing, and lintel work—all of which Yen has testified have 'nothing to do' with T-Mobile, accounted for more than $320,000 of the total work." *Id.* at 8; *see also id.* ("Plaintiff's engineer, Ted Yen, testified that this brick pointing, waterproofing, and lintel work cannot reasonably be ascribed [as] damage which could have been caused by T-Mobile's storage of cellular equipment on the roof of the building."). But nowhere in the cited deposition testimony did Yen state that the T-Mobile equipment had "nothing to do" with any brick pointing, waterproofing, or lintel work; rather, that simply was how the Rapaport Declaration characterized Yen's testimony.

In fact, Yen's testimony is at worst ambiguous on whether brick pointing, waterproofing, and lintel work were necessitated by the damage related to the T-Mobile equipment. It may raise an issue of fact about the damages caused by T-Mobile. But it certainly does not reveal the position of Virginia Properties to be frivolous, contrary to what T-Mobile led the district court to believe.

During his deposition, Yen was asked if he would agree that "the roof deteriorat[ing] and reach[ing] the end of its life expectancy" was "something that T-Mobile had nothing to do with." App'x at 367. He agreed with that commonsense proposition. *Id.* at 367-68. Brick pointing, waterproofing, and lintel work are not mentioned on either page, and the line of questioning appeared to concern "[g]eneral maintenance issues." *Id.*

Yen also testified that items 1-7 of the 9-Point Report "relate to maintenance issues that aren't specifically attributable to T-Mobile," *id.* at 544—an assertion that is ambiguous. For example, in Item 1 of the 9-Point Report, Yen had said that "loose bricks were observed on the exterior masonry walls around the *entire building*." *Id.* at 319 (emphasis added). So, according to Yen's testimony, that issue with the "entire building" was not "specifically attributable to T-Mobile." But it is a stretch to construe Yen's answer to mean that *no* loose bricks *anywhere* on the building were attributable to T-Mobile—especially when Yen specifically said elsewhere that "bricks were falling and it could have been attributable to the wall moving forward by T-Mobile's equipment pulling it." *Id.* at 2435.

Yen also was asked a number of questions about the "rear wall of the building," which all parties agree was not damaged by T-Mobile. *Id.* at 2431-32. During the course of those questions, Yen was asked about lintel repair and brick pointing. He said that lintel repair was necessary "most likely due to age," and that as to the need for brick pointing, "[s]ome of it was weathering, some of it was age, and some of it was obvious, there were cracks in it." *Id.* at 2431. But it is not at all clear that this testimony referred to the whole building, as opposed to just the rear wall (which, according to the 9-Point Report, had "three longitudinal cracks," *id.* at 319). In other words, lintel repair and brick pointing other than on the "rear wall of the building" may or may not be related to the damage caused by T-Mobile. Presumably, that issue will be addressed by expert testimony on damages.

As for "waterproofing," that was not mentioned in Yen's testimony at all,[14] so there is nothing that supports the Rapaport Declaration's assertions or the district court's decision that "waterproofing" was necessarily unrelated to the T-Mobile damage.

**\*9** *Moreover, to the extent that the cited portions of Yen's testimony might be read to suggest that any and all brick pointing or lintel work was not related to T-Mobile, other portions of Yen's testimony suggest the exact opposite:*

> A. My responsibility was solely to design and apply for the permit to fix the portion of the building in and around the T-Mobile equipment.

Q. Nothing else?

A. Nothing else.

Q. What about lintels?

A. Lintels, as pertaining to right in that area, yes.

Q. What about brick pointing?

A. Yes.

*Id.* at 2429.

The J-51 and MCI documents that Virginia Properties produced late in the game—in June and July 2015—were the basis for the district court's calculation that more than $320,000 *of the plaintiff's claimed damages cannot reasonably be ascribed to T-Mobile*. But apart from the mere fact that those documents label certain repairs as brick pointing, waterproofing, or lintel work, they do not independently prove that Virginia Properties' claims are unrelated to damage caused by T-Mobile. Yen's testimony—to the extent that it concerned brick pointing, waterproofing, and lintel work—therefore was the linchpin of the district court's conclusion that the plaintiff's damage claim was frivolous. *See also* Special App'x at 10 ("Based on the facts ..., especially the inconsistencies between Ted Yen's testimony and the Plaintiff's narrative, I am convinced that both counsel and the plaintiff have acted in bad faith."). And Yen's testimony simply did not support that conclusion.

Furthermore, it is worth noting that despite their characterization in the Rapaport Declaration, the J-51 and MCI documents appear to be largely consistent with Virginia Properties' theory on damages. For example, *with respect to a contract submitted in connection with* the J-51 application, the Rapaport Declaration states:

> The February 5 Contract[15] **specifies that brick pointing, waterproofing and structural repairs to cracks on the Building's rear wall (all work that Plaintiff's engineer testified had "nothing to do with" T-Mobile) accounted for $243,175 of DNS's price tag, and brick replacement accounted for another $62,607. The parapet walls at the south and east exposures (some of which Plaintiff alleges were leaning due to the communication facility) only accounted for $253,120 of DNS's total price of $692,012.**

App'x at 252-53. But comparing that assertion to the actual contract is illuminating: The $243,175 item in the contract included, among other things, "[p]ointing to be done to the following areas; East and South sides of the building." *Id.* at 302. It also included "waterproof coating to the following areas: The East and South sides of the building." *Id.* Likewise, the $62,607 for brick replacement was for "the East and South elevations." *Id.* So while the Rapaport Declaration made it appear as though the $243,175 and $62,607 items in the contract clearly had nothing to do with T-Mobile, those items specifically concerned the east and south sides of the building, and it is undisputed that *T-Mobile's equipment was located atop the southeast corner* (a fact that the above-quoted paragraph from the Rapaport Declaration even recognized). The unrelated "rear" wall is the *west* side of the building.

**\*10** The only expert evidence in the record (submitted after the initial sanctions decision) also supports Virginia Properties' position. That expert opinion explains how the repairs listed in the J-51 and MCI applications correspond with the square footage of the area potentially damaged by T-Mobile's equipment; how brickwork and the replacement of steel lintels would be required to support the southeast parapet; and how certain items might have been referred to differently in different documents. In other words, at least according to the plaintiff's expert, the brick pointing, waterproofing, and lintel work in and around the area where T-Mobile had its equipment might well have been necessary to remedy the damage caused by T-Mobile. If that turns out to be demonstrably incorrect, and if Virginia Properties improperly tried to shoehorn those repairs into T-Mobile's damages, then sanctions in an amount related to that conduct might be warranted. But without expert testimony on damages, that is impossible to determine. And in any event, the record as it now stands does not support such sanctions.

Thus, there was nothing in Yen's testimony that showed Virginia Properties' position to be frivolous, and the J-51 and MCI documents are largely consistent with its theory.[16] T-Mobile's claims of bad faith ultimately presented only a damages issue for trial, not grounds for sanctions.


## CONCLUSION

The record contains no evidence of deceit and evidence that is at best inconclusive as to whether Virginia Properties asked for twice what it was entitled to. The *story the sanctions motion told—one of suppressed*

Virginia Properties, LLC v. T-Mobile Northeast LLC, --- F.3d ---- (2017)

documents uncovered late in the litigation that blew a hole in the plaintiff's damage claim—appears to have been based on little more than speculation and cherry-picked deposition testimony. And while some sanctions may have been warranted due to the late production of documents, the fault for that may well lie with the plaintiff's prior counsel—not with the plaintiff itself.

Accordingly, the judgment of the district court is hereby **VACATED and REMANDED**[17] for a determination of the amount of costs and attorney's fees that should be awarded solely to compensate appellees for the failure of Virginia Properties or its attorneys to make timely disclosures.

**All Citations**

--- F.3d ----, 2017 WL 3197539

Footnotes

1     Judge Lawrence J. Vilardo, United States District Court for the Western District of New York, sitting by designation.

2     Virginia Properties has argued that it did not have a fair opportunity to contest the sanctions award prior to the court's first sanctions order filed on April 12, 2016. Under the circumstances, including the punitive nature of the sanctions and the facts revealed in all the material submitted prior to the final judgment, the entire record should be considered. We therefore do just that.

3     It is worth noting that nothing in these emails even hints at deceit. Spring does not ask Yen to shift any repair costs to T-Mobile—in fact, Spring does not even ask for any documents that show *all* the repair costs. Spring's emails instead seem to display frustration at Yen for treating all the repairs as a single project. Moreover, documents that describe repairs to the whole building, such as Yen's 9-Point Report, do not appear to have been prepared at Spring's behest (discussed more below). So Spring seems to have been intent on segregating T-Mobile costs from wear-and-tear costs, which would have been an appropriate exercise in pursuing payment from T-Mobile for only the damage that its equipment caused.

4     This is a few months after the first case management order was entered on February 10, 2014.

5     Virginia Properties was initially represented by Marc Krieg, who drafted the original complaint and produced Rule 26 disclosures. On February 7, 2014, Virginia Properties retained Lamb & Barnosky to assist Krieg. Lamb & Barnosky apparently realized the need to obtain additional documents that were not in Krieg's file, so Virginia Properties' June 2014 and August 2014 productions to Lamb & Barnosky were in response to the attorneys' questions.

6     Mark Spring is Robert's son and one of the Virginia Properties principals.

7     At around 8:00 p.m., on March 26, 2015, Mark Spring sent a lengthy email to his attorneys detailing his concerns over the emerging discovery issues. Spring noted "if I have the timeline right, it seems like we are in a bad position going into tomorrow's conference." *Id.* at 2355. On the issue of whether his father would be willing to sit for another deposition, he wrote: "My father does not want to go forward with another deposition. However, if we are forced to do so by the Court or it becomes clear at the conference that is the only way to get important discovery or items that we need, *then agree to do so....*" *Id.* (emphasis added). But the Lamb & Barnosky attorney appears to have misunderstood—or not to have read—those instructions. In the next email in the chain, the Lamb & Barnosky attorney responds: "At 8:00 p.m. on March 26, the night before the status conference, I received your e-mail below informing me that your father did not want to go forward with another deposition. At the conference, therefore, I had no choice but to object to the continued deposition, and I did so until the Judge stopped me from speaking. It was, I believe, because of our unreasonable resistance to the further deposition that the Judge accused me of 'playing games.' " *Id.* at 2354.

8     Yen: "I sent it to Tariq. ... And *I believe* subsequently to Mr. Spring." *Id.* at 357-58 (emphasis added).

9     Q: Did you email this letter to Robert Spring?
        [Yen]: Yeah, I had to have emailed it to him or sent him a copy of it.
        Q: Was it this same exact letter?

Virginia Properties, LLC v. T-Mobile Northeast LLC, --- F.3d ---- (2017)

[Yen]: *Possibly. I don't recall.*
*Id.* at 542 (emphasis added).

10    Spring answered "*I believe so*" when asked "was it also provided to you?" *Id.* at 732 (emphasis added).

11    Although the above-described disclosure failures featured prominently in the sanctions motion and the district court's decision, T-Mobile's brief on appeal focuses on other disclosure failures that were connected to Virginia Properties' J-51 and MCI applications, including what T-Mobile calls the "Detailed Architectural Drawing" (a 3-page document not discussed in the district court's decision that is repetitive of other J-51 and MCI application documents) and the "Tahir Affidavit." Those and other J-51 and MCI application documents were not disclosed by Virginia Properties until Cibella disclosed them on July 7, 2015. But there is a factual dispute over whether Lamb & Barnosky told Spring that documents connected to the J-51 and MCI applications were not relevant. And despite the importance the district court placed on those documents, they are not inconsistent—at least on their face—with Virginia Properties' theory of damages, as discussed below.

12    In an excerpt of Yen's deposition testimony not attached to the sanctions motion, which Virginia Properties later submitted, Yen was asked if "anybody [told him] to do the four bullet point letter." *Id.* at 2436. Yen answered "He asked me to write a letter just for the T-Mobile section." *Id.* Yen then was asked if "he" refers to Spring, and Yen said yes. *Id.* Yen was then asked follow-up questions about this conversation, but he was unable to remember more. *Id.* ("I can't remember back three years and two months, I'm sorry, it's mentally not possible for something that specific."). Later, Yen again was asked about this conversation and when it occurred, and Yen decided "It wasn't February 23rd, it was probably—no, it had to have been Tariq. It had to have been Tariq. Tariq would have told me you need to write a letter for just the T-Mobile portion because I hadn't talked to Mr. Spring yet, and he gave me the name and address and all the information for Mr. Spring." *Id.* at 2438. So Yen initially thought that Spring asked him to prepare the 4-Point Report, but upon reflection concluded that Tariq—not Spring—had made the request.

13    The district court's decision states that "[t]hroughout the litigation, the plaintiff maintained that T-Mobile was responsible for the entirety of the price for repairs performed by [DNS]." Special App'x at 2. As noted above, however, Virginia Properties actually provided to its attorneys documents acknowledging that at least some small amount of repairs were not attributable to T-Mobile. *E.g.*, App'x at 336.

14    Although Yen mentions a way that "coping stones" can be used to keep out water, *id.* at 2431, his testimony suggests that coping stones were replaced on the T-Mobile section. *Id.* at 2432. In any event, coping stones and waterproofing are listed separately both in exhibits attached to the complaint and in the J-51 and MCI documents.

15    App'x at 302-03. The Rapaport Declaration repeatedly refers to this document, claiming that Virginia Properties "intentionally withheld [it] until July 7, 2015." *Id.* at 252.

16    It is true that the amount $692,012—or an amount quite close to that figure—repeatedly appeared on documents in which DNS provided a repair cost estimate, and even on some that appeared to include work to the rear wall. But according to the plaintiff's expert, the "quantities of work listed in the DNS Contract and the J-51 Application (except for the oil burner) are generally related only to the areas where the T-Mobile equipment was installed and thus are related to the alleged T-Mobile work." *Id.* at 2275. Only a "minor percentage of the work may extend into areas that are unrelated to the T-Mobile equipment." *Id.* at 2275-76. So while the $692,012 figure on some application documents may to some extent be questionable, that does not mean that Virginia Properties' position was frivolous. Moreover, DNS and Yen are third parties, and in the absence of evidence showing that Virginia Properties was directing them to be deceitful, Virginia Properties should not be sanctioned simply for relying on inaccurate or inconsistent information that they provided.

17    Virginia Properties has argued that this case should be reassigned on remand because it believes the district court "will have substantial difficulty putting out of its mind those facts which led it to the overly harsh imposition of sanctions." Pl. Br. at 32. We see no reason why that relief is warranted here.

---

Virginia Properties, LLC v. T-Mobile Northeast LLC, --- F.3d ---- (2017)

# EXHIBIT F

U.S. v. Uccio, 940 F.2d 753 (1991)

KeyCite Yellow Flag - Negative Treatment
Distinguished by U.S. v. Stanley, 2nd Cir.(Vt.), April 28, 1995

940 F.2d 753
United States Court of Appeals,
Second Circuit.

UNITED STATES of America, Appellee,
v.
Nicholas UCCIO, Defendant-Appellant.

No. 1469, Docket 91-1057.
|
Argued May 20, 1991.
|
Decided July 15, 1991.

Defendant was convicted of wire fraud and conspiracy to commit wire fraud in the United States District Court for the Southern District of New York, Michael B. Mukasey, J., and he appealed. Following remand for resentencing, 917 F.2d 80, defendant again appealed. The Court of Appeals, Kearse, Circuit Judge, held that: (1) District Court was not precluded under law-of-the-case doctrine from basing upward sentencing departure on remand on ground it had rejected prior to the first appeal, where the issue was not ruled on in the first appeal and defendant was given notice that the District Court would reconsider the issue and was invited to submit position in writing, and (2) upward departure could be based on kidnapping and assault of a coconspirator in furtherance of the scheme, even though the misconduct on which the departure was premised could not have been prosecuted as a federal offense.

Affirmed.

**West Headnotes (7)**

[1]     **Criminal Law**
        Mandate and Proceedings in Lower Court

        On remand for resentencing, district court was not precluded by the law-of-the-case doctrine from basing upward sentencing departure on ground rejected by the court prior to the initial appeal, where the Court of Appeals did not rule on the issue on the first appeal, defendant on

remand was given more than two weeks' notice that district court would reconsider the basis for departure, parties were invited to submit their positions in writing, and court's reason for revisiting its ruling, that its prior belief was "incorrect," was valid.

18 Cases that cite this headnote

[2]     **Criminal Law**
        Subsequent Appeals

        Under law-of-the-case doctrine, trial court is barred from reconsidering or modifying any of its prior decisions that have been ruled on by the Court of Appeals.

43 Cases that cite this headnote

[3]     **Criminal Law**
        Jurisdiction and Proceedings of Appellate Court After Remand

        Until there is final judgment in a case, interlocutory ruling generally remains subject to reconsideration or modification, and if final judgment has been entered but has been set aside on appeal, and the matter remanded for further proceedings, the status of the case, except as to issues explicitly or implicitly decided on appeal, is as if no final judgment had been entered.

14 Cases that cite this headnote

[4]     **Courts**
        Previous Decisions in Same Case as Law of the Case

        When a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, but this

branch of the law-of-the-case doctrine, while it informs the court's discretion, does not limit the tribunal's power.

69 Cases that cite this headnote

[5]     **Courts**
        Previous Decisions in Same Case as Law of the Case

        **Within rule that disregard of earlier ruling should not be allowed to prejudice parties seeking benefit of law-of-the-case doctrine, "prejudice" does not mean harm resulting from the failure to adhere to the prior decision, but refers to lack of sufficiency of notice or lack of sufficient opportunity to prepare, armed with the knowledge that the prior ruling is not deemed controlling.**

        33 Cases that cite this headnote

[6]     **Sentencing and Punishment**
        Other Offenses, Misconduct or Charges

        In imposing sentence for wire fraud and conspiracy to commit wire fraud, it was a valid basis for upward departure under Sentencing Guidelines that defendant had kidnapped and assaulted a coconspirator in furtherance of the scheme, in the mistaken belief that the coconspirator was double-crossing him and keeping money for himself, even though the misconduct on which the departure was premised could not have been prosecuted as a federal offense. 18 U.S.C.A. §§ 2, 111, 351, 371, 1201, 1343, 3553(b); U.S.S.G. §§ 5K1.1 et seq., p.s., 5K2.4, p.s., 18 U.S.C.A.App.

        2 Cases that cite this headnote

[7]     **Sentencing and Punishment**
        Other Offenses, Misconduct or Charges

Where violent misconduct, though not itself violating federal law, is undertaken in furtherance of federal offense, district court is permitted under Sentencing Guidelines to depart upward on the basis of that misconduct. U.S.S.G. § 5K2.4, p.s., 18 U.S.C.A.App.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*754 Henry J. DePippo, Asst. U.S. Atty. (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Nelson W. Cunningham, Asst. U.S. Atty., New York City, on the brief), for appellee.

Donald D. DuBoulay, New York City, for defendant-appellant.

Before KEARSE, MAHONEY and SNEED,* Circuit Judges.

**Opinion**

KEARSE, Circuit Judge:

Defendant Nicholas Uccio appeals from a judgment entered in the United States District Court for the Southern District of New York, Michael B. Mukasey, *Judge*, convicting him on one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (1988), and one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371 (1988), following a remand from this Court for resentencing, *see United States v. Uccio*, 917 F.2d 80 (1990) (*"Uccio I "*). On remand, Uccio was sentenced principally *755 to consecutive prison terms of 60 months on the conspiracy count and 12 months on the substantive wire fraud count, to be followed by a three-year period of supervised release; he was also ordered to pay restitution to the victim of the fraud. The 72-month total prison term was an upward departure from the 51-to 63-month range indicated by the federal Sentencing Guidelines ("Guidelines"). On appeal, Uccio contends that this departure from the Guidelines range was improper principally because (1) the district court relied on a ground it had eschewed in its initial sentencing, and (2) the ground of the departure was impermissible because the conduct on which it was based could not have supported a federal conviction if prosecuted separately. For the reasons below, we reject

U.S. v. Uccio, 940 F.2d 753 (1991)

Uccio's contentions and affirm the judgment.


## I. BACKGROUND

The background of the present prosecution is set forth in some detail in *Uccio I*, 917 F.2d 80, **and we briefly summarize here only the facts and proceedings pertinent** to the present appeal. The events are no longer materially in dispute.


### A. *The Events*
One of Uccio's coconspirators, Gregory Barton, was employed by Shearson Lehman Hutton, Inc. ("Shearson"), in a department that maintained an account containing funds mistakenly transferred to Shearson by banks and other financial institutions. Barton's duties included returning the misdirected funds to their sources when the correct sources were learned. In late 1987, **Barton agreed with Uccio, codefendant Manos Sarantopoulos, and several others to attempt to transfer approximately $7.4 million from this account to an account opened by the coconspirators in the Philippines.** Barton made that transfer in January 1988.

Within a month, the coconspirators had transferred most of the money from the Philippines to a bank in Hong Kong. Sarantopoulos's job was to take the money from Hong Kong to London. He opened the appropriate account in London and then flew to Hong Kong to obtain checks for $3.5 million of the stolen money. He ultimately failed in his mission, however, because by the time he had returned to London with the checks, payment on the checks had been stopped.

When Sarantopoulos returned to New York without having completed the transfer, the other coconspirators suspected that he was double-crossing them and keeping the money for himself. Uccio and an associate therefore kidnaped Sarantopoulos, held him in a locked room, hit him, and "pricked" him with a knife in an attempt to force *him to produce the money. As a result, Sarantopoulos* agreed to attempt to retrieve the money; Uccio thereupon let him go. Though Sarantopoulos again failed, Uccio and the other coconspirators continued to pursue plans for other transfers from the Shearson account.

Uccio, arrested with several others in November 1988, was eventually convicted, after trial, of wire fraud relating to the $7.4 million transfer from Shearson and of conspiracy to commit wire fraud.

### B. *The Prior Sentencing*
The initial sentencing calculation, based on a total offense level of 22 and a criminal history category of III, resulted in a sentencing range of 51 to 63 months. The probation department's Presentence Report ("PSR"), however, **suggested several possible grounds for an upward departure, including (1) Uccio's conduct in kidnaping and** assaulting Sarantopoulos in furtherance of the wire fraud scheme, and (2) the fact that Uccio had a prior conviction that, because of its age and the brevity of the sentence, was not included in the calculation of his criminal history. In addition, the court suggested a possible upward departure based on Uccio's tape recorded statements, introduced at trial, that he was involved in numerous other "things" with his "people" in New York, which the court inferred meant other criminal conduct.

In support of its suggestion for an upward departure based on the kidnaping and assault of Sarantopoulos, the PSR relied on **\*756 Guidelines § 5K2.4, which allows an upward departure where "a person is abducted ... or unlawfully restrained to facilitate commission of the offense" of conviction. In opposition, Uccio argued that §** 5K2.4 deals only with the abduction or unlawful restraint of victims of the underlying offense and that it was not the intent of the Guidelines to enhance punishment for violence against a coparticipant in the crime. The district court apparently agreed with Uccio, stating,

> I will go along with you saying **that[.] I think [§ 5K2.4] really talks about a situation in which you in** essence kidnap a victim in some fashion or other in order to facilitate the crime, not in which *there is a* falling out among the people involved and one of them resorts to violence against the other in order to get him to do what he's supposed to do. I agree with that.

(Sentencing Transcript, February 5, 1990 ("Feb. Tr."), at 12-13.)

The district court concluded, however, that an upward departure was warranted on the other suggested grounds, stating, in pertinent part, that

> [b]ecause of the substantial record this defendant has, because of the apparent other activities that he was

> engaged in at the time, because of
> the violence that it [*sic* ] was
> associated with making sure that
> the scheme went forward, I think
> all of those factors warrant a
> sentence upward of the guideline.

(Feb. Tr. at 14-15.) Uccio was eventually sentenced principally to prison terms totaling 78 months, to be followed by a three-year term of supervised release.

## C. *The First Appeal*

Uccio appealed that sentence to this Court, challenging, *inter alia*, the upward departure from the recommended Guidelines range, and in *Uccio I* we vacated the judgment. In light of two recent decisions of this Court concerning the procedures to be followed in making an **upward departure**, *United States v. Kim*, 896 F.2d 678 (2d Cir.1990), **and** *United States v. Colon*, 905 F.2d 580 (2d Cir.1990), **neither of which had been available to the district court at its sentencing of Uccio, the government** consented to a remand for reconsideration of the upward departure. This Court agreed that a remand for resentencing was required in order to permit the court to make factual findings in accordance with those cases. *Uccio I*, 917 F.2d at 85.

**In connection with Uccio's argument to the district court that the upward departure could not permissibly be based** on the kidnaping and assault of Sarantopoulos, we observed that

> [t]he district court agreed with
> defendant's position that the use of
> violence against a person involved
> in committing a crime, rather than
> against a victim, was not the type
> of conduct contemplated as the
> basis for an upward departure
> **under** section 5K2.4.

*Id.* at 82-83. Noting that this suggestion by the court, "that it would not rely on the kidnapping as the basis for departure, arguably depriv[ed] the defense of its *opportunity to fully challenge its use as an upward* departure factor," *id.* at 86, we stated that the district court would have the opportunity on remand to clarify the "violence ... associated with making sure that the scheme went forward" on which it based its upward departure.

## D. *The Resentencing*

On remand, the district court held a conference on December 6, 1990, at which it notified the parties that it would consider departing upward from the Guidelines range on two bases: (1) Uccio's kidnaping and assault of Sarantopoulos, and (2) recorded statements by Uccio that the court interpreted to refer to other criminal activities committed by Uccio with others. The court invited the parties to submit their positions in writing. Uccio opposed both grounds. The government expressed its doubt that the latter basis could be sustained, and it urged that there be an upward departure solely on the basis of the Sarantopoulos kidnaping and assault.

At the resentencing hearing held on December 21, 1990, the court decided to ground its upward departure only on the kidnaping and assault of Sarantopoulos, indicating **\*757** that this conduct, which was designed to facilitate the commission of the underlying offenses, was an **aggravating circumstance sufficient to warrant a departure**. In response to Uccio's attorney's argument that **at the original sentencing hearing the court had viewed** Guidelines § 5K2.4 as inapplicable where the victim of the kidnaping was not a victim of the underlying crime, the court stated that

> [t]he violence is clearly
> associate[d] with the commission
> of the offense. Any views I
> expressed initially about [§] 5K2.4
> being confined strictly to victims of
> the offense I now believe to be
> incorrect. I can see an excellent
> reason why one should not confine
> *that guideline simply to victims of*
> the offense, because to do so,
> among other things, it [*sic* ] will
> simply conclude that anything that
> goes on between co-conspirators is,
> in essence, their own business, and
> that is just not warranted.

(Sentencing Transcript, December 21, 1990 ("Dec. Tr."), at 6.)

After making computations that are not challenged on this appeal, the court determined that the upward departure based on the kidnaping and assault would, by reference to analogous Guidelines provisions for federal kidnaping and assault offenses, result in an increase of offense level from 22 to 25; it decided to move only to an offense level of 24, which produced a recommended imprisonment range of 63 to 78 months. The court exercised its discretion to sentence Uccio to a total of 72 months,

rather than the maximum.

Judgment was entered as indicated above, and this appeal followed.

## II. DISCUSSION

On the present appeal, Uccio challenges the court's upward departure on several procedural and substantive grounds. For the reasons below, we reject all of his contentions.

### A. *The Procedural Contentions*

Uccio contends that, given the district court's pre-*Uccio I* ruling that Guidelines § 5K2.4 was not applicable to the Sarantopoulos kidnaping and assault, the upward departure on the basis of that conduct on remand was barred by the law-of-the-case doctrine and by this Court's *Uccio I* mandate. For several reasons, we disagree.

[1] [2] The law-of-the-case doctrine has several branches; one deals with decisions of a lower court that have been ruled on on appeal, and another deals with decisions that have not been ruled on on appeal. Under the first branch of the doctrine, the trial court is barred from reconsidering or modifying any of its prior decisions that have been ruled on by the court of appeals. "When an appellate court has once decided an issue, the trial court, at a later stage in the litigation, is under a duty to follow the appellate court's ruling on that issue." *United States v. Cirami,* 563 F.2d 26, 32 (2d Cir.1977); *see Doe v. New York City Department of Social Services,* 709 F.2d 782, 788 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478, at 792-93 (1981) (*"Wright, Miller, & Cooper "*). This principle has no applicability to the present case, for in *Uccio I* this Court did not rule on the question of whether the Sarantopoulos kidnaping and assault could be the basis of the district court's upward departure. The district court having disavowed the Sarantopoulos basis for its departure, and the government having conceded that a remand with respect to the departure was needed, we had in *Uccio I,* as Uccio states in his brief on the present appeal, "no occasion to decide whether violence toward a co-defendant can be a proper basis for an upward departure." Rather, we noted that the district court's disavowal might have prevented Uccio from making desired arguments against the Sarantopoulos basis for departure, and we remanded for further proceedings.

Hence, on remand, an upward departure on the basis of the Sarantopoulos kidnaping and assault was in no way barred by the mandate of this Court.

[3] Since *Uccio I* did not rule on the Sarantopoulos ground of departure, our vacation *758 of Uccio's sentence left the district court free to change its prior ruling on that matter, for until there is a final judgment in a case, an interlocutory ruling generally remains subject to reconsideration or modification. *See United States v. LoRusso,* 695 F.2d 45, 53 (2d Cir.1982) ( " 'whether the case *sub judice* be civil or criminal[,] so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so' ") (quoting *United States v. Jerry,* 487 F.2d 600, 605 (3d Cir.1973)), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983). If a final judgment has been entered but has been set aside on appeal, and the matter has been remanded for further proceedings, the status of the case, except as to issues explicitly or implicitly decided on appeal, is as if no final judgment had been entered. *Cf. United States v. Ayres,* 76 U.S. (9 Wall.) 608, 610, 19 L.Ed. 625 (1869) (appellate order for "new trial has the effect of vacating the former judgment, and to render it null and void, and the parties are left in the same situation as if no trial had ever taken place"); *United States v. Lawson,* 736 F.2d 835, 837 (2d Cir.1984). Thus, a "corollary [of the first branch of the law-of-the-case doctrine is] that upon remand the trial court may consider matters not expressly or implicitly part of the decision of the court of appeals." *United States v. Cirami,* 563 F.2d at 33.

[4] [5] The court's exercise of its power to reconsider and modify its prior interlocutory rulings is informed by the second branch of the law-of-the-case doctrine. That principle is that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). However, this branch of the doctrine, while it informs the court's discretion, "does not limit the tribunal's power." *Id.* Thus, we have noted that "[t]he doctrine of the law of the case is not an inviolate rule," *United States v. Birney,* 686 F.2d 102, 107 (2d Cir.1982); *see Slotkin v. Citizens Casualty Co. of New York,* 614 F.2d 301, 312 (2d Cir.1979), *cert. denied,* 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980), and the decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine, *United States v. Birney,* 686 F.2d at 107; *First National Bank of*

*Hollywood v. American Foam Rubber Corp.*, 530 F.2d 450, 453 n. 3 (2d Cir.), *cert. denied*, 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976). **In this context** "prejudice" does not mean harm resulting from the failure to adhere to the prior decision; "rather, it refers to a lack of sufficiency of notice" or a lack of sufficient "opportunity to prepare armed with the knowledge that [the prior ruling is not deemed controlling]." *United States v. Birney*, 686 F.2d at 107. **We have noted that this** Court will adhere to its own prior rulings in a given case "absent 'cogent' or 'compelling' reasons" to deviate, such as " 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear **error or prevent manifest injustice.** ' " *Doe v. New York City Department of Social Services*, 709 F.2d at 789 **(quoting** 18 *Wright, Miller, & Cooper* § 4478, at 790 (footnote omitted)); *see United States v. Yonkers Board of Education*, 856 F.2d 7, 11 (2d Cir.1988).

We find no error in the district court's rejection of this branch of the law-of-the-case doctrine in the present case. Following the remand, the district court held a conference and gave Uccio more than two weeks' notice that it would consider the Sarantopoulos kidnaping and assault as one **of the possible bases for upward departure; it invited the parties to submit their positions in writing.** Uccio submitted two written statements in opposition. At the sentencing hearing, the court afforded the parties an opportunity to elaborate on their positions orally. Hence, Uccio had ample notice and an opportunity to attempt to persuade the court that it should not alter its prior ruling.

The court's reason for revisiting its ruling was a valid one. It expressed the view **\*759** that its prior belief "about [§] 5K2.4 **being confined strictly to victims of the offense"** was "incorrect." (Dec. Tr. at 6.) Having given Uccio sufficient notice and an opportunity to be heard, it was well within the court's discretion to decline to deem itself bound by a ruling that it had come to view as wrong.

In sum, we conclude that the district court's reconsideration of the Sarantopoulos kidnaping and **assault was not foreclosed on procedural grounds.**

**B. *The Substantive Challenge to the § 5K2.4 Departure***
[6] In challenging the merits of the district court's decision to depart on the basis of the Sarantopoulos kidnaping and assault, Uccio does not contest the findings that these events occurred and that they were acts in furtherance of the offense of which Uccio was convicted. Rather, he contends principally **that no upward departure pursuant to** § 5K2.4 **was permissible because,** not being acts against **persons specially protected by federal law,** *see, e.g.,* 18

U.S.C. §§ 111, 351 (1988) **(punishing assault or kidnaping of certain federal officials),** and not having an **interstate character,** *see id.* § 1201 (1988) **(punishing kidnaping where abductee is transported in interstate or foreign commerce),** the misconduct on which the departure was premised could not have been prosecuted as a federal offense. Again, we disagree.

**A sentencing court may elect to depart from the** imprisonment range specified by the Guidelines if it finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in **formulating the guidelines that should result in a sentence different from that described."** 18 U.S.C. § 3553(b) (1988). **Under Chapter 5, Part K, of the Guidelines, the court may depart upwardly if it finds that circumstances relating to the manner, effect, or other characteristics of the offense aggravate or mitigate the offense conduct in a** way not adequately taken into consideration by existing Guidelines provisions. *See* §§ 5K2.0–5K2.15; *see generally United States v. Colon,* 905 F.2d at 585; *United States v. Ferra,* 900 F.2d 1057, 1062 (7th Cir.1990).

[7] **Fraudulent schemes do not typically involve violent conduct,** and the Guidelines sections dealing with fraud offenses do not make provision for adjustments on account of kidnapings or assaults occurring in the course of the fraud. In identifying grounds for departure, however, § 5K2.4 **of the Guidelines, as a "Policy Statement,"** provides specifically for an upward departure when the offense of conviction is not kidnaping but has entailed a kidnaping. That section reads as follows:

> **If a person was abducted, taken hostage, or unlawfully restrained to** facilitate commission of the offense or to facilitate the escape from the scene of the crime, the court may increase the sentence above the authorized guideline range.

Section 5K2.4 **does not by its terms require that the abduction or unlawful restraint constitute an independent** federal offense in order to authorize a departure, and we see no reason to read in such a requirement, for the **enhanced punishment is not directed toward separately** indictable criminal conduct but rather toward conduct aggravating the offense of conviction. We conclude that where the violent misconduct, though not itself violating federal law, was undertaken in furtherance of the federal offense, the district court is permitted to depart on the **basis of that misconduct.** *Cf. United States v. Kikumura,* 918 F.2d 1084, 1105 n. 26 (3d Cir.1990).

In arguing for the contrary result, Uccio places principal reliance on *United States v. Kim,* 896 F.2d 678. In *Kim,* noting that Chapter 5, Part K departures apply only to "acts of misconduct not resulting in conviction," we directed sentencing judges to measure the extent of those departures by reference to the penalties that would have been provided by the Guidelines if the misconduct at issue had resulted in a federal conviction, in order that "an act that need be proven only by a preponderance of evidence, ... [not] result in more punishment than would be called for if the act had been proven beyond a reasonable doubt and had *760 resulted in conviction," 896 F.2d at 684. *Accord United States v. Kikumura,* 918 F.2d at 1112; *United States v. Ferra,* 900 F.2d at 1062-63. Uccio's reliance on *Kim* is misplaced for two reasons. First, we were confronted there with misconduct that could have grounded a federal conviction, not with misconduct that arguably did not violate federal law, and hence we had no occasion to consider the latter. Second, we dealt not with whether the ground of departure was authorized but only with whether the extent of the departure was reasonable, *see* 18 U.S.C. § 3742(e)(3) (1988) (imposition of a sentence outside of the applicable Guidelines range must not be "unreasonable"); *United States v. Palta,* 880 F.2d 636, 639 (2d Cir.1989) (extent of an authorized departure must be reasonable). Thus, *Kim* did not purport to deal with the question presented here, *i.e.,* whether, as to misconduct that could not have grounded a federal conviction, there can be any departure at all.

Finally, we note that it is not clear from Uccio's brief on appeal whether he continues to pursue the main argument he made in the district court both in the pre-*Uccio I* proceedings and on remand, *i.e.,* that § 5K2.4 does not apply to acts of violence against coparticipants in the crime. In any event, we reject this proposition. Though most often the victim of the kidnaping would be a target of the crime or an innocent bystander, the scope of this section is not so limited. There is no language indicating that the "person" abducted cannot be a coconspirator. As the district court reasoned on remand, to ignore an abduction carried out in furtherance of the underlying offense simply because the abductee was a member of the conspiracy would be to "conclude that anything that goes on between coconspirators is, in essence, their own business." (Dec. Tr. at 6.) No such policy is to be found in the law or in the Guidelines, and we agree with the district court's post-*Uccio I* view that § 5K2.4 encompasses abduction, unlawful restraints, and other violence against coconspirators.

In sum, given the facts found by the district court, the departure pursuant to § 5K2.4 on the basis of the kidnaping and assault of coconspirator Sarantopoulos was authorized.

## CONCLUSION

We have considered all of Uccio's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.

**All Citations**

940 F.2d 753

Footnotes

*     Honorable Joseph T. Sneed, of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

---

End of Document                © 2017 Thomson Reuters. No claim to original U.S. Government Works.